CODY DOIG
ASSISTANT ATTORNEY GENERAL
ALASKA DEPARTMENT OF LAW
1031 W. 4th Ave., Suite 200
Anchorage, AK 99501-1994
(907) 269-5211
Cody.Doig@alaska.gov

WILLIAM J. JACKSON
JENNIFER C. BARKS
MARIA F. PIMIENTA
KELLEY DRYE & WARREN LLP
515 Post Oak Boulevard, Suite 900
Houston, TX 77027
(713) 355-5000
BJackson@kelleydrye.com
JBarks@kelleydrye.com
MPimienta@kelleydrye.com

ANDREW W. HOMER
KELLEY DRYE & WARREN LLP
7825 Fay Avenue, Suite 200
La Jolla, California 92037
(858) 795-0426
AHomer@kelleydrye.com

ATTORNEYS FOR THE PLAINTIFFS

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| THE STATE OF ALASKA; AND THE ALASKA DEPARTMENT OF ENVIRONMENTAL CONSERVATION | § § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | NO._____ |
| UNITED STATES OF AMERICA; UNITED STATES DEPARTMENT OF INTERIOR; DEB HAALAND, in her official capacity as Secretary of the United States Department of Interior; BUREAU OF LAND MANAGEMENT; AND TRACY STONE-MANNING, in her official capacity as Director of the Bureau of Land Management, | § § § § § § § § | |
| *Defendants*. | § § | |

## COMPLAINT

## (Administrative Procedure Act (5 U.S.C. §§ 703, 706(1)) and Declaratory Judgment Act (28 U.S.C. § 2201))

Plaintiffs, The State of Alaska ("Alaska" or "State"), and the Alaska Department of Environmental Conservation ("DEC"), file this Complaint against the above-named Defendants, the United States of America (the "United States"), the United States Department of Interior ("USDOI"), Deb Haaland, in her official capacity as Secretary of USDOI, the USDOI's Bureau of Land Management ("BLM"), and Tracy Stone-Manning in her official capacity as Director of BLM (collectively, "Defendants"), and allege as follows:

## INTRODUCTION

1. In 1971, Congress enacted the Alaska Native Claims Settlement Act ("ANCSA") to create a "fair and just settlement of all claims by Natives and Native groups of Alaska, based on aboriginal land claims[.]" 43 U.S.C. § 1601(a).

2. Through ANCSA, the United States sought to extinguish all Alaska Natives'[1] claims to aboriginal title to over 360 million acres of land in Alaska, in exchange for title to a designated 44 million acres of land ("ANCSA Lands") and other compensation.

---

[1] ANCSA defines "Native" as:

> a citizen of the United States who is a person of one-fourth degree or more Alaska Indian (including Tsimshian Indians not enrolled in the Metlaktla Indian Community) Eskimo, or Aleut blood, or combination thereof. The term includes any Native as so defined either or both of whose adoptive parents are not Natives. It also includes, in the absence of proof of a minimum blood quantum, any citizen of the United States who is regarded as an Alaska Native by the Native village or Native group of which he claims

3. However, ANCSA did not fairly and justly settle the loss of aboriginal land rights for either Alaska Natives or the State. As later became apparent to Alaska Natives and the State, significant portions of over one thousand parcels (that make up over 17.6 million acres of the ANCSA Lands), given by the United States as consideration for the Alaska Natives' rights taken, were contaminated with hazardous substances such as arsenic, asbestos, lead, mercury, pesticides, polychlorinated biphenyls, and/or other contaminants *before* they were transferred by the United States. In all, out of the 44 million acres the Alaska Natives were promised over fifty years ago, a significant number of the transferred property contains at least some areas that were and remain contaminated and unfit for economic development and/or traditional use. Today, Alaska holds title to some of these ANCSA Lands.

4. This historical contamination on ANCSA Lands poses health and safety concerns to Alaska and Alaska Native communities, negatively impacts natural and subsistence resources, requires the State to expend ongoing investigation, enforcement, and remediation costs, and restricts economic activity in and of the State.

5. Alaska has repeatedly advocated for the United States to take responsibility for the significant social, ecological, and economic costs and burdens that the conveyance

---

to be a member and whose father or mother is (or, if deceased, was) regarded as Native by any village or group. Any decision of the Secretary regarding eligibility for enrollment shall be final.

43 U.S.C. § 1602(b).

of contaminated ANCSA Lands has caused and will continue to cause the State and recipient Alaska Natives.

6.    Furthermore, since at least 1990, the United States Congress has acknowledged this inequity and the adverse impacts of the ANCSA Lands' contamination, and has directed the Executive Branch to take steps to address it. On at least three occasions Congress has ordered the USDOI to inventory, investigate, report on, then prepare a plan to remediate, each of the several hundred contaminated ANCSA Lands. And for over thirty years, USDOI and other agencies of the Executive Branch have failed to satisfy these Congressional mandates.

7.    Despite  not providing a pre-transfer notice of contamination on the ANCSA Lands it conveyed, the United States has, for decades, largely ignored these demands by Congress and has taken no meaningful steps to  remedy contamination on ANCSA Lands that it pawned off on Alaska Natives. To date, the United States has refused to take responsibility for this gross injustice, and has made no concrete plans or financial commitments to remediate this pre-existing contamination.

## JURISDICTION

8.    Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (civil action under the laws of the United States) and 28 U.S.C. § 2201 (declaratory relief).

## VENUE

9.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), (c)(2), and (e)(1).

## PARTIES

10.     Plaintiff, Alaska, is a sovereign state in the United States of America.

11.     Plaintiff, Alaska Department of Environmental Conservation ("DEC"), is a department of the Alaska government created by AS 44.17.005(14), formed to "conserve, improve, and protect [Alaska's] natural resources and environment and control water, land and air pollution, in order to enhance the health, safety, and welfare of the people of the state and their overall economic and social well-being." *See* AS 46.03.010(a); AS 46.03.020(10)(G). Alaska holds a trust interest in the natural resources, including water, land and air resources, within its territorial jurisdiction. Alaska Const. art. VIII, §§ 3, 4. To manage these natural resources, the State directed the DEC "to conserve, improve, and protect [Alaska's] natural resources and environment. . . ." AS 46.03.010(a). As such, Alaska has an affirmative obligation to protect its citizens and the natural resources within the bounds of the state.

12.     Defendant, the United States of America, is named for the actions of its departments, agencies, and instrumentalities, including, but not limited to, USDOI and its subsidiary agency the federal BLM.

13.     Defendant, USDOI is an agency within the Executive Branch of the federal government. USDOI is responsible, in part, for managing public lands and upholding Federal trust responsibilities to Alaska Natives.

14.     Defendant, Deb Haaland, is the Secretary of the USDOI.

15.     Defendant, BLM is an agency within the USDOI, and is the entity that conveyed the ANCSA Lands to Alaska Natives under ANCSA.

16.     Defendant, Tracy Stone-Manning, is the Director of the BLM.

## BACKGROUND FACTS

### A. THE ALASKA NATIVE CLAIMS SETTLEMENT ACT

17.     For thousands of years, Alaska Natives have inhabited the land now known as the State of Alaska.

18.     Alaska Natives' aboriginal land claims date back to 1867, when the United States entered into the Treaty of Cession with Russia, and acquired the land that now makes up the State of Alaska. *See* Treaty of Cession, U.S.–Russ., March 30, 1867, 15 Stat. 539. Despite the centuries-long continuous presence of Alaska Natives on this land, the Treaty of Cession did not address their aboriginal rights. Instead, the treaty merely stated that "[t]he uncivilized tribes [would] be subject to such laws and regulations as the United States may, from time to time, adopt in regard to aboriginal tribes of that country." *Id.* at 542. Notably, Congress did not attempt to "isolate [Alaska Natives] on reservations" as it had done in the "lower 48 States." *See Yellen v. Confederated Tribes of Chehalis Reservation*, 141 S. Ct. 2434, 2438 (2021) (citations and internal quotations omitted).

19.     Almost a century later, in 1959, Congress designated Alaska as the 49th state with the implementation of the Alaska Statehood Act ("Statehood Act"). *See* An Act to Provide for the Admission of the State of Alaska Into the Union, Pub. L. No. 85-508, 72 Stat. 339 (1958). The Statehood Act allowed Alaska to select certain federal lands in order to obtain all rights, title, and interests in that land. *Id.* § 6(a). In the 1960s, as Alaska began selecting such lands under the Statehood Act, certain Alaska Natives began protesting many of the State's selections. Thus, in 1966, the Secretary of Interior froze Alaska's

continuing selection of lands under the Statehood Act until conflicting claims could be resolved. *See Alaska v. Haaland*, 3:21-cv-0158-HRH, at *1 (D. Alaska Mar. 14, 2022).

20.     With the discovery of significant oil resources in Prudhoe Bay in 1968, a demand for a cross-state pipeline arose. A pipeline was designed to run along Alaska Native lands, and five Alaska Native villages sought to enjoin the USDOI from issuing the construction permit. An injunction was issued in 1970, creating a sudden urgency for Congress to resolve Alaska Natives' "largely unsettled"[2] aboriginal title claims in order to avoid further construction delays and/or other complications with respect to the building and long-term operation of the pipeline. Consequently, within one year of the injunction's issuance, Congress passed ANCSA. *See Alyeska Pipeline Service Co. v. Kluti Kaah Native Village*, 101 F.3d 610, 613 (9th Cir. 1996) ("[O]ne of Congress' fundamental goals in enacting ANCSA: allowing for the creation of a trans-Alaska oil pipeline, unencumbered by Native land claims.").

21.     The enactment of ANCSA in 1971 revolutionized the United States' relations with Alaska Natives and directly impacted Alaska Natives' property rights.

22.     Congress expressly outlined its intent that the settlement under ANCSA be "fair and just" and that it "be accomplished rapidly, with certainty, in conformity with the real economic and social needs of Natives. . . ." 43 U.S.C § 1601(a)–(b).[3]

---

[2] *Yellen*, 141 S. Ct. at 2438–39.

[3] ANCSA's legislative history echoes Congress's intent that the lands conveyed under it be used for economic development for the benefit of Alaska Natives. *See* H.R. REP. No. 92-523, at 2195 (1971) ("[T]he Committee took into consideration the land needed for ordinary village sites and village expansion, the land needed for a subsistence hunting and fishing economy by many of the Natives, and the land needed by the Natives as a form of

23.     To effectuate the settlement, ANCSA created a system of "Regional Corporations" and "Villages,"[4] to which BLM would convey the ANCSA Lands and award the monetary compensation for subsequent distribution to member Alaska Natives. Through this approach, Congress avoided creating "a reservation system or lengthy wardship or trusteeship," diverging from previous approaches in policies dealing with Native lands in the other 48 states. *Id.* § 1601(b).

24.     To expedite the conveyance of the lands and administration of the compensation promised, Congress established a three-step process. First, ANCSA required the Secretary of Interior to withdraw certain public lands for transfer.[5] *Id.* § 1610. Second, the ANCs and Village Corporations had to select acres from the lands withdrawn based on the Native population within each corresponding village. *Id.* § 1611. The Secretary of Interior was also required to allocate additional lands to the ANCs, which in turn had to

---

capital for economic development."). Courts have similarly confirmed that "Congress[] inten[ded] that Native corporations benefit from the land" conveyed under ANCSA. *See, e.g.*, *Koniag, Inc. v. Koncor Forest Resource*, 39 F.3d 991, 998 (9th Cir. 1994).

[4] ANCSA divided Alaska into thirteen regions and created thirteen private, for-profit Alaska Native "Regional Corporations" ("Alaska Native Corporations" or "ANCs"). *See* 43 U.S.C. § 1606(a), (c). Because the thirteen regions and corresponding ANCs encompass approximately 220 Alaska Native "villages," ANCSA further established and recognizes a "Village Corporation" for each of them. *Id.* § 1607. With respect to properties transferred to Alaska Natives pursuant to ANCSA, 22 million acres are shared by the ANCs and Village Corporations, with an ANC owning the subsurface estate and a Village Corporation owning the surface estate for each conveyed land. ANCs own the remaining 18 million acres. *Id.* §§ 1611, 1613.

[5] ANCSA allowed the ANCs and Village Corporations to select lands across the designated regions. *Id.* § 1611. However, the federal government narrowed the eligible lands by excluding lands that it had reserved for itself or other entities. *Id.* § 1610. Thus, despite ANCSA's promising language, the ANCs and Village Corporations were not truly at liberty to select the lands they desired for economic and/or traditional purposes.

reallocate to the villages. *Id.* § 1611(b). Finally, after the ANCs and Village Corporations selected the lands, the Secretary of Interior was required to "[i]mmediately. . . issue a patent" of the lands. *Id.* § 1613(a)–(b), (e).

25.     Village Corporations and ANCs had to select the lands from basic maps and/or surveys, without any detailed information on the land's prior use, then-existing contamination, and related limitations on potential future land use.

26.     Despite the abundance of land available in the territorial jurisdiction of the State of Alaska, BLM largely conveyed lands whose prior use(s) resulted in contamination that prevented or made cost prohibitive many potential development and/or traditional uses. BLM conveyed lands whose prior uses, among others, included heavy industrial and coal mining operations, landfill operations, drilling operations, munition plants, and military operations. Thus, although ANCSA had promised Alaska Natives lands suitable for economic development and traditional uses, the conveyed lands often left Alaska Native recipients with the burden of past industrial or military activity and precluded them from pursuing economic development opportunities. Some of these ANCSA Lands were subsequently transferred to the State of Alaska.

27.     Legacy pollution has persisted in the environment on and has emanated from contaminated ANCSA Lands for decades, and has impeded Alaska Natives from putting ANCSA Lands to efficient economic and beneficial use. Further, Alaska Natives' access to traditional foods (through hunting, fishing, and farming) and resources has been impeded by the contamination.

28.     Ultimately, USDOI and BLM's conveyance of contaminated lands has frustrated Congress's intent that the lands conveyed through ANCSA help foster the Alaska Natives' "economic and social needs." *Id.* § 1601(b).

29.     The United States failed to fulfill the purpose and bargain of ANCSA; instead, it foisted the economic, social, environmental, and health burdens and costs of historical contamination on Alaska and Alaska Natives.

## B.  CONGRESSIONAL DIRECTIVES TO THE UNITED STATES

30.     Over the past several decades, USDOI and the BLM have systematically disregarded and ignored Congressionally mandated duties with respect to the ANCSA Lands.

31.     For over thirty years, Alaska, the ANCs, and the Villages have continuously raised concerns over the adverse impacts of the contaminated ANCSA Lands and requested that the United States remedy the wrong it created by saddling Alaska Natives with the contaminated lands.

32.     Congress has repeatedly agreed with Alaska. Acknowledging the inequity of the transaction and the risks of the contamination on ANCSA Lands, Congress has issued at least three directives ordering the USDOI and/or BLM to identify ANCSA Lands that were contaminated before the transfer to Alaska Natives and Alaska, investigate the scope and extent of the contamination, and prepare plans for the remediation of the contaminated ANCSA Lands.

33.     **1990 Directive.**  Congress first directed the USDOI and BLM to take action to assess this grave injustice in 1990. Through the Department of Interior and Related

Agencies Appropriations Act, 1991, Pub. L. No. 101-512, § 326, 104 Stat. 1978 (1990) ("1990 Directive") (Ex. A), Congress "directed" the Secretary of Interior to, by March 1, 1991, report to Congress on the following:

> (1) Identification of lands and properties that were transferred to Alaska Native Corporations under [ANCSA] as amended, which at the time of transfer were represented or disclosed by the Federal Government as being free from contaminants, and which subsequent to transfer, were discovered to be contaminated; and

> (2) Identification of lands and properties that the Federal Government knowingly transferred to Alaska Native Corporations with contaminants.

Ex. A, p. 65.

34. To date, Alaska has been unable to identify *any* response to this directive. On information and belief, USDOI and BLM have utterly and inexcusably failed to meet the clear requirements of the 1990 Directive.

35. The United States' complete lack of response to the 1990 Directive was a loud and clear signal that the United States simply does not care about or prioritize the injustice that it created and that the Alaska Natives and Alaska itself have endured for decades.

36. **1995 Directive.** Congress issued a second directive in 1995, when Congress amended ANCSA. *See An Act to Amend the Alaska Native Claims Settlement Act, and for Other Purposes*, Pub. L. No. 104-42, 109 Stat. 358 (1995) (codified as 43 U.S.C § 1629f) ("1995 Directive") (Ex. B). Under the newly-amended ANCSA, Congress ordered that "[w]ithin 18 months of [November 2, 1995], and after consultation with the Secretary of Agriculture, State of Alaska, and appropriate Alaska Native Corporations and

organizations, the Secretary [of Interior] shall submit" a report addressing the issue of contamination on "lands conveyed or prioritized for conveyance" pursuant to ANCSA including:

> **(1)** existing information concerning the nature and types of contaminants present on such lands prior to conveyance to Alaska Native Corporations;
>
> **(2)** existing information identifying to the extent practicable the existence and availability of potentially responsible parties for the removal or remediation of the effects of such contaminants;
>
> **(3)** identification of existing remedies;
>
> **(4)** recommendations for any additional legislation that the Secretary concludes is necessary to remedy the problem of contaminants on the lands; and
>
> **(5)** in addition to the identification of contaminants, identification of structures known to have asbestos present and recommendations to inform Native landowners on the containment of asbestos.

Ex. B, p. 3–4.

37. In December 1998 (a year and one-half late), BLM, on behalf of USDOI, submitted a woefully inadequate report to Congress. Instead of undertaking a diligent search for the information Congress directed it to gather—identifying the nature and types of contaminants, potentially responsible parties, existing remedies, recommending additional legislation to remedy the contamination, and identifying structures with asbestos—BLM's report merely contained a barebones acknowledgment of the conveyance of 650 contaminated sites through ANCSA, and a general overview of the applicable environmental laws. U.S. Department of the Interior, *Hazardous Substance Contamination of Alaska Native Claims Settlement Act Lands in Alaska* (1998) ("1998 Report") (Ex. C).

38. While the 1998 Report provided a *preliminary* inventory of the sites and the suspected contaminants—solvents, mining waste chemicals, PCBs, spilled fuels,

explosives, antifreeze, batteries, oil and gas exploration wastes, pesticides, friable asbestos, mercury, arsenic, benzene, lead and leaded paint, dioxin, and POL (petroleum, oil, and lubricant)—it failed to identify the *nature* of the contamination at each conveyed site. Instead, BLM merely noted that field investigations would be required to "characterize the nature and extent of contamination and to determine if contamination occurred prior to, or after, conveyance. . . ." Ex. C, p. 16. Yet, a lot of unknowns remained, and BLM did not conduct the field investigations it deemed necessary to collect the information requested by Congress.

39.     Further, the 1998 Report only gave cursory attention to four objectives from the 1995 Directive—identifying potentially responsible parties, recommending legislation necessary to remedy the situation, identifying any existing remedies, and identifying structures with asbestos and recommendations to inform Native landowners on the containment of asbestos. While BLM did provide general information on the topics, including a number of environmental laws, it merely outlined the information, without relating or applying it to the specific situation pertaining to the ANCSA Lands. BLM's 1998 Report provided generalized information, was unhelpful in identifying and remedying the contamination, and ignored and failed to comply with the 1995 Directive.

40.     These deficiencies have not been corrected to date.

41.     BLM's failure to follow Congress's 1995 Directive has significantly injured Alaska and Alaska Natives. For the entire twenty-seven years since Congress directed BLM to address the contamination, Alaska and Alaska Natives have alone shouldered the social and economic costs and burdens of the historical contamination. BLM's failure has

frustrated Alaska and Alaska Native's abilities to fully and fairly remedy the contamination of ANCSA Lands. BLM's inaction has allowed hazardous substances and contamination to move and spread through Alaska's surface waters, groundwater, and natural resources. Moreover, BLM has ignored Congress's directive to "identify[] to the extent practicable the existence and availability of potentially responsible parties. . ." and during those twenty-seven years, memories have grown dim, witnesses have died, records have been destroyed, and BLM has instead thwarted the identification of potentially responsible parties and investigation of the contamination.

42. **2014 Directive.** More than two decades after Congress first directed the Executive Branch to act, the contamination on ANCSA Lands continued unabated and uncontained, and Congress's 1990 and 1995 Directives remained largely unfulfilled. In a third attempt to address this continuing wrong, Congress issued a third directive in 2014 in the Joint Explanatory Statement of Public Law 113-235 ("2014 Directive") (Ex. D):

> The Bureau shall provide the House and Senate Committees on Appropriations with a detailed report within 180 days of enactment of this Act, which includes the following information: (1) a comprehensive inventory of contaminated sites conveyed through ANCSA, including sites identified subsequent to the 1998 report; (2) an updated status on the six recommendations listed in the 1998 report; and (3) a detailed plan on how the Department intends to complete cleanup of each contaminated site.

Ex. D, p. 455.

43. In response, in 2016—approximately two years after Congress issued the 2014 Directive and one-and-a-half years after it was supposed to—BLM issued a 2016 Update to the USDOI's 1998 Report to Congress ("2016 Report") (Ex. E).[6]

44. For a third time, BLM and USDOI did not fully nor timely comply with their Congressional-directed duties, and to date, the majority of the 2014 Directive remains unfulfilled.

45. BLM did not correct the deficiencies in its 1998 Report. Instead, in its update on the status of the 1998 Report recommendations, BLM made clear that it would not assume responsibility for its role in the contamination, alleging that it "lacks the statutory authority to take action on" five of six recommendations. *See* Ex. E, p. 25.

46. The information that the 2016 Report does provide is vague and lacks specific factual information on the inventoried sites and contamination. It identifies 920 contaminated sites conveyed under ANCSA and generally recommends that these sites be investigated and/or cleaned up. *See* Ex. E, p. 10.[7] Instead of preparing a "comprehensive" inventory of contaminated ANCSA Lands, the 2016 Report merely provides the

---

[6] An electronic version of the 2016 Report is also available at: https://www.blm.gov/sites/blm.gov/files/documents/files/PublicRoom_Alaska_Contaminated Lands_ReporttoCongress_0.pdf.

[7] BLM issued one update to the 2016 Report in or around June 2019, when BLM added approximately 259 sites to its inventory of contaminated ANCSA Lands (which now identifies a total of 1,179 contaminated ANCSA-transferred sites). However, this update did not correct BLM and USDOI's past failures to comply with the 1990, 1995, and 2014 Directives. Since that time, BLM and USDOI have not provided Alaska or DEC with an update to the inventory or the work required on ANCSA Lands by Congress's 1990, 1995 or 2014 directives.

inventoried sites' coordinates, with very few (if any) notes about the conveyance or site. *See* Ex. E, p. 66–103. This report simply contains a chart with snippets of generalized information, land coordinates, and minimal (if any) notes about each conveyance or site. Essential information was either omitted, not gathered, or ignored, and the inventory does not come close to being "comprehensive" as required by the 2014 Directive. In sum, the 2016 Report wholly fails to address the large data gaps Congress instructed BLM and USDOI to fill.

47.    Even worse, in direct contravention of the 2014 Directive, BLM failed to prepare and submit "detailed plan on how the Department intends to complete cleanup of each contaminated site." Although the 2016 Report provides additional recommendations, the "recommendations" attempt to shift responsibility for the contaminated ANCSA Lands onto Alaska.[8] Ex. E., p. 28–29. For example, BLM "recommended" that *DEC* "identify those sites that require remedial action" and document specific information related to the sites—**a task Congress expressly directed the USDOI, of which BLM is a part, to complete**. Ex. E, p. 28.  Further, BLM "recommended" that *DEC* "implement a remedial action process." Again, this "recommendation" simply attempts to shift onto DEC responsibility for an action Congress expressly directed USDOI to complete. By trying to side-step the mandates in the 2014 Directive, BLM attempted to shirk its and USDOI's responsibilities and force them onto Alaska and DEC.

---

[8] Although the recommendations resulted in the creation of working groups, the working groups merely serve as figureheads with members acknowledging the groups' lack of progress and failure to yield results.

## C. ALASKA HAS GROWN TIRED OF THE UNITED STATES' UNLAWFUL DELAY AND INACTION.

48.     At various times across some thirty years, Alaska has requested, pleaded, and demanded that the United States initiate clean-up actions at the ANCSA Lands, follow Congress' directives, and make this right. Yet, the United States has been largely unresponsive to Alaska's efforts.

49.     In the 1998 Report, the DOI explicitly represented that "[w]ith respect to lands yet to be conveyed, we will take all practicable steps to avert the future conveyance of contaminated land." Ex. C, p. 7, 10. Yet **over thirty percent of the parcels listed on the Defendants' current inventory of contaminated ANCSA Lands were conveyed to Alaska Natives after 1999**. It is clear that the Defendants took minimal to no precautions to ensure they were conveying clean lands to the Alaska Natives and that Defendants will not commit to remedying the decades of harm that they have caused.

50.     Most recently, on May 27, 2021, Alaska sent three letters to the United States—one addressed to President Joseph R. Biden, another to the Secretary of Interior, and the third to the Secretaries of Defense, Interior, and Agriculture—demanding that USDOI and BLM fulfill their Congressionally mandated duties to complete a full site inventory, identify potentially responsible parties, and initiate site characterization and cleanup of the contamination on the ANCSA Lands. *See* Ex. F, G, H.[9]

---

[9]     Electronic versions of the three letters are also available at: https://dec.alaska.gov/spar/csp/federal/formal-correspondence/

51.     The United States initially responded on January 6, 2022, denying responsibility and stating that "BLM has no continuing obligation for documenting or remediating contaminated sites conveyed under ANCSA . . . ." *See* Letter from Raina Thiele, Senior Advisor, United States Department of Interior, to Jason W. Brune, Commissioner, Alaska Department of Environmental Conservation (Jan. 6, 2022) (Ex. I).

52.     Congress has spoken repeatedly, unequivocally memorializing the United States' obligation to address the historical contamination on ANCSA Lands, yet USDOI, BLM and the entire Executive Branch have ignored Congress for over thirty years.  It is time that the Judicial Branch weigh in, declare Alaska's rights and DOI's authority to carry out its Congressional mandates, and force the United States to address this disgraceful inequity now.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Action to Compel Agency Action Unlawfully Withheld Under the Administrative Procedure Act ("APA") 5 U.S.C. § 706(1)

53.     Alaska restates and incorporates by reference herein the allegations set forth above.

54.     The APA dictates that agencies must conclude a matter presented to it "within a reasonable time."  5 U.S.C. § 555(b).

55.     The APA authorizes this Court to "compel agency action unlawfully withheld or unreasonably delayed[.]" *Id.* § 706(1).

56.     Congress has imposed required duties on the Executive Branch of the United States related to identifying and remedying the contamination at the Sites and other lands

conveyed under ANCSA three times over the last thirty years, in the 1990 Directive, 1995 Directive, and 2014 Directive.

57.     In 1990, Congress directed USDOI to identify lands transferred under ANCSA that the United States represented or disclosed as being free from contaminants, but which were subsequently found to be filled with pre-conveyance contaminants. Congress also required the USDOI to identify lands that it knowingly transferred with contaminants.

58.     Congress mandated that the DOI comply with the 1990 Directive by March 1, 1991. Ex. A, p. 65.

59.     The USDOI never complied with the 1990 Directive.

60.     In 1995, Congress directed the USDOI (through BLM) to provide comprehensive information identifying the nature and type of contaminants present on the conveyed lands, potentially responsible parties, existing remedies, recommendations for additional legislation, and structures contaminated with asbestos.

61.     Congress mandated that the DOI comply with the 1995 Directive "[w]ithin 18 months of [November 2, 1995]." Ex. B, p. 3.

62.     As outlined in detail in preceding paragraphs, USDOI did not comply with the 1995 Directive. Instead, the USDOI simply provided a preliminary inventory of the sites, gave generalized information, and failed to prepare a clean-up plan to remedy the contamination at each inventoried site.

63.     In 2014, Congress directed the USDOI to provide a comprehensive inventory of contaminated sites conveyed under ANCSA, update the status of the six

recommendations listed in the 1998 Report, and develop a cleanup plan for each contaminated site.

64.     Congress mandated compliance with the 2014 Directive within "180 days of enactment of this Act." Ex. D, p. 455.

65.     USDOI did not comply with the 2014 Directive. Once again, the United States provided barebones information that did not address the data gap Congress directed it to fill. Moreover, USDOI attempted to wash its hands of the matter by improperly shifting its Congressionally mandated responsibilities onto Alaska and DEC.

66.     Ultimately, the USDOI's failure to respond to the 1990 Directive, and untimely, incomplete, and wholly inadequate responses to the 1995 and 2014 Directives, leave Congress's mandates unanswered.

67.     In response to Alaska's 2021 letters to the United States demanding that USDOI and BLM fulfill their Congressionally mandated duties, Defendants responded on January 6, 2022, denying responsibility and stating that "BLM has no continuing obligation for documenting or remediating contaminated sites conveyed under ANCSA . . . ." Ex. I.

68.     By allowing the contamination to go unchecked, unabated, and unresolved for decades, USDOI and BLM have made matters worse, as the contamination has spread and at least some evidence necessary to identify potentially responsible parties and the history, source and scope of contamination has likely been destroyed or become increasingly difficult to ascertain and analyze. As such, the issuance of the reports does not remedy the agency's decision to unlawfully withhold action to comply with the three Congressional directives over the last three decades.

69.     The historical contamination has harmed the natural resources held by Alaska in trust for its citizens, and is endangering the public health and minimizing economic opportunities within Alaska.

70.     The Defendants' failure to comply with Congressionally directed duties within the prescribed time periods is unlawful and has caused and continues to cause Alaska harm, including, but not limited to, natural resources damages and lost use and value of these natural resources.

71.     Defendants' violation is continuous and ongoing. The United States will continue to violate the APA until it fully and completely complies with its Congressional duties.

72.     Alaska and DEC bring this action because they have no other means to compel the United States to perform its duties to investigate and clean up the contamination.

73.     Alaska is entitled to relief pursuant to 5 U.S.C. § 706(1) compelling the United States to comply with the Congressionally mandated obligations set forth in the 1990 Directive, 1995 Directive, and 2014 Directive.

74.     Alaska is further entitled to declaratory relief under 5 U.S.C. § 703 and 28 U.S.C. § 2201, declaring that Defendants' failures to comply with the 1990, 1995, and 2014 Directives constitute agency action unlawfully withheld under the APA.

## SECOND CAUSE OF ACTION
## Action to Compel Agency Action Unreasonably Delayed Under the APA 5 U.S.C. § 706(1)

75.     Alaska restates and incorporates by reference herein the allegations set forth above.

76.     The APA dictates that agencies must conclude a matter presented to it "within a reasonable time." 5 U.S.C. § 555(b).

77.     The APA authorizes this Court to "compel agency action unlawfully withheld or unreasonably delayed[.]" *Id.* § 706(1).

78.     The allegations in ¶¶ 30 through 47 additionally constitute an agency action unreasonably delayed under the APA to the extent that Defendants are continuing to undertake efforts to complete the tasks mandated by the 1990, 1995, and 2014 Directives.

79.     The historical contamination has harmed the natural resources held by Alaska in trust for its citizens, and is endangering the public health and minimizing economic opportunities within Alaska.

80.     Defendants' delay in complying with Congressionally directed duties have caused and are continuing to cause Alaska harm including, but not limited to, natural resources damages and lost use and value of these natural resources.

81.     Defendants' violation is continuous and ongoing. The United States will continue to violate the APA until it fully and completely complies with its Congressional duties.

82.     Alaska and DEC have brought this action because they have no other means to compel the United States to perform its duties to investigate and clean up the contamination.

83.     Alaska is entitled to relief pursuant to 5 U.S.C. § 706(1), compelling the United States to comply with the Congressionally mandated obligations set forth in the 1990 Directive, 1995 Directive, and 2014 Directive.

84.     Alaska is further entitled to declaratory relief under 5 U.S.C. § 703 and 28 U.S.C. § 2201, declaring that Defendants' failures to comply with the 1990, 1995, and 2014 Directives constitute agency action unreasonably delayed under the APA.

## THIRD CAUSE OF ACTION
### Declaratory Relief under the APA (5 U.S.C. § 703) and Declaratory Judgment Act (28 U.S.C. § 2201)

85.     Alaska restates and incorporates by reference herein the allegations set forth above.

86.     Section 703 of the APA authorizes "legal action, including actions for declaratory judgments . . . ." 5 U.S.C. § 703.

87.     The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction. . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration. . . ." 28 U.S.C. § 2201(a).

88.     An actual controversy now exists between Alaska and the United States in that Alaska contends that Defendants are responsible for assessing and remedying the injustices created by Defendants' transfers of land to Alaska Natives under ANCSA.

Defendants' continuous failure to comply with the 1990, 1995, and 2014 Directives has directly impacted Alaska as described above.

89. Defendants have denied any further responsibility for complying with the applicable Congressional Directives. Ex. I ("BLM has no continuing obligation for documenting or remediating contaminated sites conveyed under ANCSA . . . ."). As part of their justification, Defendants claim that they lack the authority to perform the investigatory and other actions demanded of them, *i.e.* complying with the 1990, 1995, and 2014 Directives.

90. Alaska seeks a judicial declaration pursuant to 5 U.S.C. § 703 and 28 U.S.C. § 2201 that Defendants' failure to comply with the 1990, 1995, and 2014 Directives constitutes agency action unlawfully withheld and/or unreasonably delayed in violation of the APA.

91. Alaska seeks a further judicial declaration pursuant to 5 U.S.C. § 703 and 28 U.S.C. § 2201 that Defendants have the authority to fulfill the 1990 Directive, 1994 Directive, and 2014 Directive.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, The State of Alaska and the Department of Environmental Conservation, request that this Court enter judgment in their favor against Defendants, and award the following relief:

92. Pursuant to 5 U.S.C. § 703 and 28 U.S.C. § 2201, declare that:

    a. Defendants' failure to comply with the 1990 Congressional Directive to identify the lands contaminated and the United States' knowledge of the

contamination of the Sites and other lands conveyed under ANCSA constitutes an agency action unlawfully withheld and unreasonably delayed in violation of the APA;

b. Defendants' failure to fully and thoroughly comply with their mandated duties under the 1996 Amendment to ANCSA, 43 U.S.C. § 1629(f), constitutes an agency action unlawfully withheld and unreasonably delayed in violation of the APA;

c. Defendants' failure to timely, fully, and thoroughly comply with the 2014 Congressional Directive constitutes an agency action unlawfully withheld and unreasonably delayed in violation of the APA; and

d. Defendants have the authority to fulfill the 1990 Directive, 1994 Directive, and 2014 Directive.

93.    Pursuant to 5 U.S.C. § 706(1), issue an order compelling the United States to comply with:

a. the 1990 Directive;

b. the 1996 Directive (1996 Amendment to ANCSA); and

c. the 2014 Directive.

94.    Grant any further relief, at law or in equity, as this Court deems just and proper.

Dated: July 15, 2022                          Respectfully submitted,

                                              TREG TAYLOR
                                              ATTORNEY GENERAL

                               By:            _____
                                              CODY DOIG (AK Bar No. 2109091)
                                              ASSISTANT ATTORNEY GENERAL
                                              ALASKA DEPARTMENT OF LAW
                                              1031 W. 4th Ave., Suite 200
                                              Anchorage, AK 99501-1994
                                              Telephone: (907) 269-5211
                                              Cody.Doig@alaska.gov

                                              **KELLEY DRYE & WARREN LLP**
                                              WILLIAM J. JACKSON
                                              (*Pro Hac Vice Admission Pending*)
                                              Texas Bar No. 00784325
                                              JENNIFER C. BARKS
                                              Texas Bar No. 24087257
                                              (*Pro Hac Vice Admission Pending*)
                                              MARIA F. PIMIENTA
                                              Texas Bar No. 24125685
                                              (*Pro Hac Vice Admission Pending*)
                                              KELLEY DRYE & WARREN LLP
                                              515 POST OAK BLVD., SUITE 900
                                              HOUSTON, TEXAS 77027
                                              Telephone:  (713) 355-5000
                                              BJackson@kelleydrye.com
                                              JBarks@kelleydrye.com
                                              MPimienta@kelleydrye.com

                                              ANDREW W. HOMER
                                              (*Pro Hac Vice Admission Pending*)
                                              California Bar No. 259872
                                              7825 Fay Avenue, Suite 200
                                              La Jolla, CA 92037
                                              Telephone: (858) 795-0426
                                              AHomer@kelleydrye.com

                                              **ATTORNEYS FOR THE PLAINTIFFS**