CODY DOIG
ASSISTANT ATTORNEY GENERAL
ALASKA DEPARTMENT OF LAW
1031 W. 4th Ave., Suite 200
Anchorage, AK 99501-1994
(907) 269-5211
Cody.Doig@alaska.gov


ATTORNEYS FOR THE PLAINTIFFS

WILLIAM J. JACKSON
JENNIFER C. BARKS
MARIA F. PIMIENTA
KELLEY DRYE & WARREN LLP
515 Post Oak Boulevard, Suite 900
Houston, TX 77027
(713) 355-5000
BJackson@kelleydrye.com
JBarks@kelleydrye.com
MPimienta@kelleydrye.com

ANDREW W. HOMER
KELLEY DRYE & WARREN LLP
7825 Fay Avenue, Suite 200
La Jolla, California 92037
(858) 795-0426
AHomer@kelleydrye.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| THE STATE OF ALASKA; AND THE ALASKA DEPARTMENT OF ENVIRONMENTAL CONSERVATION | § § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | NO: 3:22-cv-00163-HRH |
| UNITED STATES OF AMERICA; UNITED STATES DEPARTMENT OF INTERIOR; DEB HAALAND, in her official capacity as Secretary of the United States Department of Interior; BUREAU OF LAND MANAGEMENT; AND TRACY STONE-MANNING, in her official capacity as Director of the Bureau of Land Management, | § § § § § § § § | **PLAINTIFFS' RESPONSE IN OPPOSITION TO FEDERAL DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT** |
| *Defendants*. | § § | |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS .................................................................................................. 3

STANDARD OF REVIEW ................................................................................................ 11

ARGUMENT ........................................................................................................................ 12

I.    Defendants' Motion Should Be Denied because Plaintiffs Have Plausibly Pled Their Claims under APA Section 706(1). .......................................................... 12

    A.  Alaska Seeks to Compel Discrete "Agency Actions" that Defendants Are Required to Take. ............................................................................................ 13

        i.    "Agency Action" Is a Broadly-Defined Term. ........................................ 13

        ii.    Courts May Compel "Required" Agency Actions. .................................. 16

        iii.    The 1998 Report Responding to the 1995 Directive Binds DOI and BLM to Take Discrete Agency Actions. ................................................ 17

        iv.    The 2014 Directive Requires DOI and BLM to Take Discrete Agency Actions. ........................................................................................ 22

    B.  Alaska Has Sufficiently Alleged that DOI and BLM Have Failed to Take Actions Required by the 1998 Report and 2014 Directive. .............................. 24

II.    Defendants' Motion Should Be Denied Because Plaintiffs Have Sufficiently Alleged Standing. .................................................................................................. 28

    A.  Alaska Has Pled an Injury- in-Fact—and Defendants Do Not Challenge this Element. ...................................................................................................... 29

    B.  Alaska's Injuries Are Fairly Traceable to Defendants' Challenged Conduct. ..... 31

    C.  Alaska's Injuries Will Likely Be Redressed by a Favorable Ruling .................. 33

LEAVE TO AMEND ......................................................................................................... 35

CONCLUSION .................................................................................................................... 35

State of Alaska, et al. v. United States, et al.
Response in Opposition to Defendants' Motion to Dismiss

i

Case 3:22-cv-00163-HRH   Document 25   Filed 01/11/23   Page 2 of 43

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re A Cmty. Voice*,
  878 F.3d 779 (9th Cir. 2017) ..................................................................... 26

*Adams v. U.S. Forest Srvc.*,
  671 F.3d 1138 (9th Cir. 2012) ................................................................... 12

*Albert v. Kilolo Kijakazi*,
  No. 1:21-cv-0004-HRH, 2021 U.S. Dist. LEXIS 146471 (D. Alaska
  Aug. 5, 2021) ...................................................................................... 33, 34

*Belcher v. Wal-Mart Stores*,
  No. 3:20-cv-00194-SLG, 2020 U.S. Dist. LEXIS 171183 (D. Alaska
  Sep. 18, 2020) .......................................................................................... 35

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988)............................................................................. 14, 23

*Cent. Delta Water Agency v. United States*,
  306 F.3d 938 (9th Cir. 2002) ..................................................................... 29

*Citizens Against Burlington, Inc. v. Busey*,
  938 F.2d 190 (D.C. Cir. 1991) .................................................................. 16

*City of Sausalito v. O'Neill*,
  386 F.3d 1186 ............................................................................................ 29

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
  35 F. Supp. 3d 1137 (N.D. Cal. 2014) ...................................................... 23

*Fed. Election Comm'n v. Akins*,
  524 U. S. 11 (1998).................................................................................... 32

*Friends of Animals v. Sparks*,
  200 F. Supp. 3d 1114 (D. Mont. 2016).................................................20, 22

*Fund for Animals v. U.S. Bureau of Land Mgmt.*,
  460 F.3d 13 (D.C. Cir. 2006) ...............................................................16, 21

*Hercules Inc. v. U.S. Envtl. Prot. Agency*,
    938 F.2d 276 (D.C. Cir. 1991) ...................................................................... 9

*Herron v. Heckler*,
    576 F. Supp. 218 (N.D. Cal. 1983) ............................................................. 14

*Leite v. Crane Co.*,
    749 F.3d 1117 (9th Cir. 2014) .................................................................... 12

*Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*,
    459 F. Supp. 2d 874 (9th Cir. 2006) ........................................................... 28

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ...................................................................... 28, 31, 33

*Marathon Oil v. Lujan*,
    937 F.2d 498 (10th Cir. 1991) ............................................................. 16, 22

*Nat. Res. Def. Council, Inc. v. U.S. Envtl. Prot, Agency*,
    956 F.3d 1134 (9th Cir. 2020) .................................................................... 26

*Nat'l Urban League v. Ross*,
    489 F. Supp. 3d 939 (N.D. Cal. 2020) ........................................................ 14

*Norton v. S. Utah Wilderness Alliance*,
    542 U.S. 55 (2004) ................................................................................. *passim*

*Or. Nat. Desert Ass'n v. Bushue*,
    3:19-cv-1550-SI (D. Or. Dec. 7, 2022) ................................................. 19, 20

*Oregon v. Legal Servs. Corp.*,
    552 F.3d 965 (9th Cir. 2009) ...................................................................... 28

*Padilla Constr. Co. v. Acosta*,
    No. 18-1214-GW(AGRx), 2022 U.S. Dist. LEXIS 95887 (C.D. Cal.
    Mar. 25, 2022) ........................................................................................... 17

*Pershing Park Villas v. United Pacific*,
    219 F.3d 895 (9th Cir. 2000) ...................................................................... 28

*Pub. Citizen v. U.S. Dep't of Justice*,
    491 U.S. 440 (1989) ................................................................................... 32

*In re Pub. Emps. for Envtl. Responsibility*,
    957 F.3d 267 (D.C. Cir. 2020) ........................................... 15, 23, 24, 27

*Service v. Dulles*,
    354 U.S. 363 (1957) ................................................................... 19

*Sims v. Ellis*,
    972 F. Supp. 2d 1196 (D. Idaho 2013) .......................................... 15, 16, 22

*Sovereign Iñupiat for a Living Arctic v. U.S. Bureau of Land Mgmt.*,
    516 F. Supp. 3d 943 (D. Alaska 2021) ........................................ 12

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ................................................................ 29

*Stephen v. Bureau of Indian Educ.*,
    No. 21-15097, 2022 U.S. App. LEXIS 6755 (9th Cir. Mar. 16, 2022) ...................... 13

*Trout Unlimited v. Lohn*,
    No. C05-1128C, 2005 WL 3242262 (W.D. Wash. Nov. 30, 2005), *aff'd
    and rev'd in part, and remanded on other grounds*, 559 F.3d 946 (9th
    2009) .................................................................................. 19, 20

*U.S. Dep't of Labor v. Kast Metals Corp.*,
    744 F.2d 1145 (5th Cir. 1984) .................................................... 14

*United Farm Workers v. Perdue*,
    No. 1:20-cv-01452-DAD-JLT, 2020 U.S. Dist. LEXIS 201069 (E.D.
    Cal. Oct. 28, 2020) .................................................................. 15, 28

*United States v. Students Challenging Regulat. Agency Proc.*,
    412 U.S. 669 (1973) ................................................................... 30

*Vaz v. Neal*,
    33 F.4th 1131 (9th Cir. 2022) .................................................... 13

*W. Watersheds Project v. Zinke*,
    441 F. Supp. 3d 1042 (D. Idaho 2020) ........................................ 14

*Washington Utils. & Transp. Comm'n v. FCC*,
    513 F.2d 1142 (9th Cir. 1975), *overruled on other grounds by Nevada v.
    Burford*, 918 F.2d 854 (9th Cir. 1990) ...................................... 29, 32

*White v. Lee*,
    227 F.3d 1214 (9th Cir. 2000) .................................................... 12

*Wilson v. Watt*,
    703 F.2d 395 (9th Cir. 1983) ...................................................... 17

*Zixiang Li v. Kerry*,
    710 F.3d 995 (9th Cir. 2013) ................................................................................ 11

**Statutes**

5 U.S.C. § 551(4), (13) ........................................................................ 13, 14, 20, 21 23

5 U.S.C. § 555(b) ....................................................................................................... 12

5 U.S.C. § 701(a)(2) .................................................................................................. 28

5 U.S.C. § 706(1) ................................................................................................ *passim*

5 U.S.C. § 706(2)(A) ................................................................................................ 28

42 U.S.C. § 9620(h)(3)–(4) ............................................................................ 4, 9, 19, 32

43 U.S.C § 1601(a)–(b) ................................................................... 1, 4, 11, 19, 20

43 U.S.C. § 1606(a), (c) ............................................................................................. 4

43 U.S.C. § 1611 ....................................................................................................... 4

43 U.S.C. § 1613(a)–(b), (e) ...................................................................................... 4

An Act to Amend the Alaska Native Claims Settlement Act, Pub. L. No.
    104-42, 109 Stat. 358 (1995) (codified at 43 U.S.C § 1629f) ("1995
    Directive") ....................................................................................................... *passim*

Department of Interior and Related Agencies Appropriations Act, 1991,
    Pub. L. No. 101-512, § 326, 104 Stat. 1978 (1990) ("1990 Directive") ............. 5, 6, 17

Joint Explanatory Statement of Public Law 113-235 ("2014 Directive") ................ *passim*

**Other Authorities**

Fed. R. Civ. P. 12(b)(1), (b)(6) ............................................................................ 11, 12

State of Alaska, et al. v. United States, et al.
Response in Opposition to Defendants' Motion to Dismiss

v

Case 3:22-cv-00163-HRH   Document 25   Filed 01/11/23   Page 6 of 43

Plaintiffs, the State of Alaska and the Alaska Department of Environmental Conservation ("ADEC") (together, "Alaska"), file this Response in Opposition to Federal Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint (Dkt. 24) (the "Motion").

## **INTRODUCTION**

Alaska seeks to compel the United States Department of the Interior ("DOI" or "Department") and United States' Bureau of Land Management ("BLM") to comply with Congressional, statutory, and self-imposed obligations requiring them to address one of the most significant environmental injustices perpetuated by the federal government—its conveyance of contaminated lands to Alaska Natives under the Alaska Native Claims Settlement Act ("ANCSA"). In 1971, ANCSA extinguished Alaska Natives' aboriginal land rights in exchange for 44 million acres of economically beneficial land from the United States. ANCSA prescribed that this exchange was supposed to be "fair and just" and that it be "accomplished . . . in conformity with the real economic and social needs of Natives. . . ." 43 U.S.C § 1601(a)–(b). Instead, a significant portion of lands BLM transferred under ANCSA are not suitable to meet Natives' needs and instead are contaminated with hazardous, toxic, and otherwise dangerous substances including arsenic, asbestos, lead, mercury, pesticides, polychlorinated biphenyls, and others. Much of this contamination was caused by past United States military or other federal land uses.

Awareness of this issue grew, and beginning in 1990, Congress directed DOI and/or BLM no fewer than three times to take certain actions to investigate and address the widespread contamination that posed a daily risk to human health and the environment.

But through half-measures and delay tactics, DOI and BLM have shirked responsibility and perpetuated this injustice for decades. Defendants now seek to shift onto Alaska the burden of investigating, inventorying, coordinating, remediating, and otherwise shouldering the significant financial costs of addressing the immense problem caused by DOI and BLM.

Defendants' extensive inaction leaves Alaska with no other recourse. It now brings this suit under Section 706(1) of the Administrative Procedure Act ("APA"), asking this Court to compel the Defendants to complete actions that Congress has mandated, that Defendants are legally obligated to take, and that DOI and BLM have pledged to take. To state a claim under APA § 706(1), Alaska must plead that the Federal Government, (1) had a non-discretionary duty to act; (2) unlawfully failed to act or unreasonably delayed in acting on that duty; and (3) that the failure or delay has harmed Alaska. APA § 706(1). No more, no less.

Alaska has met its burden. Plaintiffs allege that the Congressional mandates in 1995 and 2014, and the obligations DOI and BLM assumed in the resulting reports, call for discrete agency actions that DOI and BLM are legally required, but have failed, to take in violation of the APA. Specifically, Alaska alleges that Defendants have failed to: (1) complete a comprehensive inventory of contaminated ANCSA Land; (2) prepare a cleanup plan outlining steps for how the Department intends to cleanup each contaminated site; (3) prevent future conveyances of contaminated lands; and (4) make reasonable progress on the multitude of actions it agreed to coordinate and undertake in the 1998 Report. This

State of Alaska, et al. v. United States, et al.
Response in Opposition to Defendants' Motion to Dismiss

2

Case 3:22-cv-00163-HRH   Document 25   Filed 01/11/23   Page 8 of 43

failure to act impedes Congress's ultimate purpose to have DOI clean up the contaminated ANCSA Lands and violates Section 706(1) of the APA.

Ignoring these allegations, Defendants' Motion contends that Alaska fails to plead a discrete agency action that it was required to take because Congress only tasked DOI with "reporting requirements" which they allege have been met. Their argument contravenes Congress's mandates and mischaracterizes Alaska's allegations.

Defendants further argue that Alaska has not pled an injury sufficiently traceable to Defendants' inaction or redressable by this Court. Defendants again ignore Alaska's numerous allegations describing injuries it has suffered due to DOI and BLM's inaction, including heightened risk to human health and the environment; economic and natural resource injuries; the frustration of Alaska's ability to carry out its obligations and duties as a State and agency owed to its people and lands; and the significant economic injuries it will suffer as a result of Defendants' continued efforts to not only ignore its obligations but to shift those obligations—including investigating, inventorying, and initiating the remedial process for each of the contaminated ANCSA Lands—onto Alaska. And, Alaska pleads that it will continue to suffer these injuries until DOI and BLM take the actions Alaska seeks to compel.

Alaska's First Amended Complaint ("FAC") (ECF No. 19) contains numerous, detailed factual allegations demonstrating that Alaska is entitled to the relief it seeks. Defendants' Motion should be denied.

## **STATEMENT OF FACTS**

Congress enacted ANCSA in 1971 to create a "fair and just settlement of all claims

by Natives and Native groups of Alaska, based on aboriginal land claims[.]" 43 U.S.C. § 1601(a). Through ANCSA, the United States extinguished all Alaska Natives' aboriginal land claims to over 360 million acres of land, in exchange for title to 44 million acres of land ("ANCSA Lands") and compensation. FAC ¶ 2. This exchange was to be "fair and just" and that it be "accomplished . . . in conformity with the real economic and social needs of Natives. . . ." 43 U.S.C § 1601(a)–(b).

To effect these transfers, the Secretary of Interior would withdraw public lands for transfer, Alaska Native Corporations ("ANCs") and Village Corporations[1] would select acres from those lands, and then the Secretary would issue a patent to the lands. FAC ¶ 24; 43 U.S.C. §§ 1611, 1613(a)–(b), (e). Village Corporations and ANCs had to select the lands from basic maps and/or surveys, without any detailed information on the land's prior use or then-existing contamination. FAC ¶ 25.

As later became apparent, despite the abundance of land available in Alaska, BLM conveyed lands whose prior use(s)[2] resulted in contamination that prevented or made cost prohibitive many potential development projects and/or traditional uses. FAC ¶ 26. Significant portions of over one thousand parcels (that make up over 17.6 million acres of

---

[1] ANCSA divided Alaska into thirteen regions and created thirteen private, for-profit Alaska Native "Regional Corporations" ("Alaska Native Corporations" or "ANCs"). 43 U.S.C. § 1606(a), (c). Because the thirteen regions and corresponding ANCs encompass approximately 220 Alaska Native "villages," ANCSA further established and recognizes a "Village Corporation" for each of them. *Id.* § 1607. With respect to properties transferred pursuant to ANCSA, 22 million acres are shared by the ANCs and Village Corporations, with an ANC owning the subsurface estate and a Village Corporation owning the surface estate. ANCs own the remaining 18 million acres. *Id.* §§ 1611, 1613.

[2] ANCSA Lands' prior uses included military operations, munition plants, heavy industrial and mining operations, landfill operations, drilling operations, and others. FAC ¶ 26.

the ANCSA Lands), exchanged by the United States as consideration for extinguishing Alaska Natives' rights, were at the time of transfer (and remain today) contaminated with hazardous substances. FAC ¶ 3. Legacy pollution has persisted in the environment on, and has emanated from, contaminated ANCSA Lands for decades, endangering Alaska Natives, and Alaska's natural resources, impeding Alaska Natives and the State from putting ANCSA Lands to efficient economic and beneficial use, and limiting Alaska Natives' access to traditional sustenance resources. FAC ¶ 27.

For over thirty years, Alaska, the ANCs, and the Village Corporations have continuously requested that the United States remedy the wrong it created by saddling Alaska Natives with the contaminated lands and leaving Alaska, rather than itself, to deal with the problem. FAC ¶ 30. Congress, acknowledging the inequity of the scheme and the risks the contamination pose, has issued three legislative directives ordering DOI and/or BLM to take actions to investigate and address the issue. FAC ¶ 32.

Congress first directed DOI and BLM to take action to assess this grave injustice in 1990. Through the Department of Interior and Related Agencies Appropriations Act, 1991, Pub. L. No. 101-512, § 326, 104 Stat. 1978 (1990) ("1990 Directive") (FAC Ex. A), Congress "directed" the Secretary of Interior to, by March 1, 1991, report to Congress on the following:

> **(1)** Identification of lands and properties that were transferred to Alaska Native Corporations under [ANCSA] as amended, which at the time of transfer were represented or disclosed by the Federal Government as being free from contaminants, and which subsequent to transfer, were discovered to be contaminated; and
>
> **(2)** Identification of lands and properties that the Federal Government

knowingly transferred to Alaska Native Corporations with contaminants. FAC Ex. A, p. 65. The 1990 Directive expressly stated that DOI did not need to conduct field-investigations, and thus gave DOI less than four months to comply. FAC ¶ 33.

"To fulfill the requirements of the" 1990 Directive, the United States delivered an eight-page report to Congress on April 15, 1991 ("1991 Report"). *See* FAC Ex. J, p. 2. Based largely upon a small set of responses to a written questionnaire sent to ANCs (which had an approximately 10% response rate of only 22 responses), the 1991 Report identified thirty-eight sites within ten regions "conveyed and subsequently found to contain hazardous substances" including asbestos, pesticides, dioxin, mining waste chemicals, battery acid, explosives, solvents, PCBs, and live ammunition. *Id.*, p. 2, 6-11.

In 1995, Congress issued a second directive through an amendment to ANCSA. *See An Act to Amend the Alaska Native Claims Settlement Act, and for Other Purposes*, Pub. L. No. 104-42, 109 Stat. 358 (1995) (codified at 43 U.S.C § 1629f) ("1995 Directive") (FAC Ex. B). Under the newly-amended ANCSA, Congress ordered that "the Secretary [of Interior] shall submit" a report regarding contamination on "lands conveyed or prioritized for conveyance" pursuant to ANCSA including:

> **(1)** existing information concerning the nature and types of contaminants present on such lands prior to conveyance to Alaska Native Corporations;
>
> **(2)** existing information identifying to the extent practicable the existence and availability of potentially responsible parties for the removal or remediation of the effects of such contaminants;
>
> **(3)** identification of existing remedies;
>
> **(4)** recommendations for any additional legislation that the Secretary concludes is necessary to remedy the problem of contaminants on the lands; and
>
> **(5)** in addition to the identification of contaminants, identification of structures known to have asbestos present and recommendations to

State of Alaska, et al. v. United States, et al.
Response in Opposition to Defendants' Motion to Dismiss

6

Case 3:22-cv-00163-HRH   Document 25   Filed 01/11/23   Page 12 of 43

inform Native landowners on the containment of asbestos.

FAC Ex. B, p. 3–4. Congress gave DOI a deadline of eighteen months to carry out this more exhaustive review and report. FAC ¶ 37.

In December 1998 (eighteen months late), BLM, on behalf of DOI, submitted a woefully inadequate report to Congress. FAC ¶ 38; *Hazardous Substance Contamination of Alaska Native Claims Settlement Act Lands in Alaska* (1998) ("1998 Report") (FAC Ex. C) (the "1998 Report"). BLM's report merely contained a barebones acknowledgment of the conveyance of not 38, as previously reported, but 650 contaminated sites through ANCSA, and a general overview of the applicable environmental laws. FAC ¶ 38. While the 1998 Report provided a *preliminary* inventory of the sites and the suspected contaminants—solvents, mining waste chemicals, PCBs, spilled fuels, explosives, antifreeze, batteries, oil and gas exploration wastes, pesticides, friable asbestos, mercury, arsenic, benzene, lead and leaded paint, dioxin, and POL (petroleum, oil, and lubricant)—it failed to identify the nature, extent, source, and/or timing of the contamination at each conveyed site. FAC ¶ 39. Instead, BLM emphasized that "field investigations are necessary to characterize the nature and extent of contamination and to determine if contamination occurred prior to, or after, conveyance. . . ." FAC Ex. C, p. 16.

In the 1998 Report, BLM acknowledged that "[t]here is a need to do more." FAC Ex. C, p. 40. To that end, BLM pledged to "coordinate implementation of" six recommendations it determined necessary "to fully identify contaminated sites and cleanup needs on ANCSA lands." FAC Ex. C, p. 7. These recommendations included:

**(1)** Establish a forum of ACNSA landowners and Federal, State, and local and Tribal

agencies in Alaska for exchanging information, discussing issues, and setting priorities;

**(2)** "Create and maintain a coordinated, comprehensive inventory database of contaminated sites in Alaska . . .";

**(3)** Apply EPA policies to ANCSA landowners, not to impose landowner liability to federal transferees for contamination existing at the time of conveyance, where the landowner has not contributed to the contamination;

**(4)** Analyze the data collected and report[ed] to Congress on sites not covered in existing programs and report back to Congress in 30 months on whether further Federal programs or actions are needed;

**(5)** Modify policies, where needed, to address contaminants and structures that may affect public health and safety on ANCSA lands; and

**(6)** Continue to develop, under the leadership of EPA and other relevant agencies, a process to train and enable local residents to better participate in cleanup efforts.

*See* FAC Ex. C, p. 40-41 (paraphrased, quoted where indicated). BLM/DOI explicitly pledged that "[w]ith respect to lands yet to be conveyed, we will take all practicable steps to avert the future conveyance of contaminated land." FAC Ex. C, p. 7, 10.

Sixteen years later, the contamination on ANCSA Lands continued unabated and uncontained, and Congress's 1995 Directive and Defendants' related obligations remained almost entirely unfulfilled. FAC ¶ 44. In a third attempt to address this continuing wrong, Congress issued yet another legislative directive in 2014 in the Joint Explanatory Statement of Public Law 113-235 ("2014 Directive") (FAC Ex. D):

> The Bureau shall provide the House and Senate Committees on Appropriations with a detailed report within 180 days of enactment of this Act, which includes the following information: (1) a comprehensive inventory of contaminated sites conveyed through ANCSA, including sites identified subsequent to the 1998 report; (2) an updated status on the six recommendations listed in the 1998 report; and (3) a detailed plan on how the Department intends to complete cleanup of each contaminated site.

FAC Ex. D, p. 455. Approximately two years after Congress issued the 2014 Directive and again one-and-a-half years late, BLM issued the 2016 Update to DOI's 1998 Report to Congress (FAC Ex. E) ("2016 Report"). The contents of the report make clear that DOI

and BLM have disregarded their commitments undertaken in 1998 and obligations mandated by the 2014 Directive. FAC ¶ 45. The 2016 Report was not a "comprehensive inventory" but was instead a self-styled "preliminary inventory" identifying now 920 contaminated sites conveyed under ANCSA, with only barebones information. *See* FAC Ex. E, p. 66–103; FAC ¶ 49. More glaring, however, was BLM's failure to prepare a "detailed plan on how the *Department* intends to complete cleanup of each contaminated site"—much less begin to execute such a plan. FAC ¶¶ 46, 50 (emphasis added).

Instead of fulfilling their obligations, DOI and BLM made "recommendations" on how *ADEC* could step in and do what Congress mandated the *Department* to do. FAC ¶ 51. For example, BLM "recommended" that *ADEC* "identify those sites that require remedial action" and document specific information related to the sites—**a task Congress expressly directed DOI, of which BLM is a part, to complete**. FAC Ex. E, p. 28. Further, BLM "recommended" that *ADEC* "implement a remedial action process"—**yet another action Congress expressly directed DOI to take** through both the 2014 Directive (requiring plan for how "*the Department intends to complete cleanup* at each contaminated site") and other federal statutes.[3] FAC ¶ 51 (emphasis added).

_____

[3] CERCLA requires BLM and DOI to determine whether certain federally-owned properties transferred on or after October 16, 1990 are contaminated or not prior to their transfer. 42 U.S.C. § 9620(h)(3), (4); *Hercules Inc. v. U.S. Envtl. Prot. Agency*, 938 F.2d 276, 280 (D.C. Cir. 1991). If the property is contaminated, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA") requires BLM and DOI, to conform with certain notice requirements, including disclosing the information in the agency's possession, and certain deed requirements, including for certain properties on which hazardous substances **were stored for one year, or known to be released or disposed of, "a covenant warranting that . . . any additional remedial action found to be necessary after the date of such transfer shall be conducted by the United States**[.]" 42 U.S.C. § 9620(h)(3) (emphasis added). CERCLA also requires DOI and/or BLM to identify uncontaminated federal facilities they seek to transfer. This

Instead of preparing an *actual detailed plan* on how the "Department intends to complete cleanup of each contaminated site", in their 2016 Report, DOI and BLM submitted a preliminary set of "Recommendations for a Clean-Up Plan" which shift the burden and responsibility of creating a plan to Alaska. FAC Ex. E, p. 28-29. And although BLM updated the preliminary inventory once in June 2019 by adding approximately 259 sites, it has taken *no* steps to convert this "preliminary" inventory into a "final one", leaving DOI and BLM's obligation unfulfilled. FAC ¶ 49 n.8. And, despite BLM's 1998 pledge to take steps to prevent further transfers of contaminated lands to Alaska Natives, **over thirty percent of the parcels listed on the Defendants' current inventory of contaminated ANCSA Lands were conveyed to Alaska Natives *after* the 1998 Report**. FAC ¶ 54.

To date, a vast majority of inventoried ANCSA Lands (and potentially many others yet to be identified) remain burdened with contamination that poses risks to human health and the environment, and inherently limits the use of such lands. DOI and BLM's failures have frustrated Alaska's abilities to fully and fairly remedy the contamination of ANCSA Lands, and have allowed hazardous substances and contamination to move and spread through Alaska's surface waters, groundwater, and natural resources. FAC ¶ 43. This historical contamination poses health and safety concerns to Alaska and Alaska Native communities, negatively impacts natural and subsistence resources, requires the State to expend funds on ongoing investigation and remediation costs, and restricts economic

---

identification requires "an investigation of the real property" including through visual and physical inspection prior to transferring it. *Id.* § 9620(h)(4).

State of Alaska, et al. v. United States, et al.
Response in Opposition to Defendants' Motion to Dismiss

10

Case 3:22-cv-00163-HRH   Document 25   Filed 01/11/23   Page 16 of 43

activity. FAC ¶ 4.

In May 2021, Alaska wrote to DOI (among others) to (yet again) raise the "substantial risks" caused by the lingering contamination and to implore them to fulfill their obligations. FAC Ex. H. It took DOI approximately **eight months to compose a less than three page letter** vaguely claiming they lack authority to accomplish their Congressionally-mandated obligations. FAC Ex. I.

BLM's conveyance of contaminated lands has frustrated Congress's intent to foster the Alaska Natives' "economic and social needs" (43 U.S.C. § 1601(b)); instead, these land transfers have foisted the economic, social, environmental, and health burdens and costs of historical contamination on Alaska and Alaska Natives. FAC ¶¶ 28-29. And now, Defendants refuse to take the required steps to rectify this wrong.

This problem has grown and festered because of DOI and BLM's egregious delay and inaction. Alaska has exhausted all alternate options and now brings this suit seeking to compel Defendants to fulfill long overdue obligations that are mandated, and critical first steps required to fulfill Congress's ultimate intent that DOI "complete cleanup" of each of the contaminated ANCSA Lands.

## <u>STANDARD OF REVIEW</u>

Defendants moved to dismiss for failure to state a claim under Federal Rule of Civil Procedure ("Rule") 12(b)(6), and lack of subject matter jurisdiction pursuant to Rule 12(b)(1). "To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Zixiang Li v. Kerry*, 710 F.3d 995, 999 (9th Cir. 2013) (quotations omitted) "The

State of Alaska, et al. v. United States, et al.
Response in Opposition to Defendants' Motion to Dismiss

11

Case 3:22-cv-00163-HRH   Document 25   Filed 01/11/23   Page 17 of 43

court accepts the complaint's well-pleaded factual allegations as true and draws all reasonable inferences in the light most favorable to the plaintiff." *Adams v. U.S. Forest Srvc.*, 671 F.3d 1138, 1142-43 (9th Cir. 2012).

A motion to dismiss pursuant to Rule 12(b)(1) "can be either facial or factual" attack. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). A "district court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).

## ARGUMENT

I.  **Defendants' Motion Should Be Denied because Plaintiffs Have Plausibly Pled Their Claims under APA Section 706(1).[4]**

Pursuant to the APA, an agency must "conclude" a "matter presented to it" "within a reasonable time." 5 U.S.C. § 555(b). The APA authorizes courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). To assert a claim under Section 706(1), a plaintiff must allege that "an agency failed to take a *discrete* agency action that it is *required* to take." *Wilderness Alliance*, 542 U.S. at 64 (emphasis in

---

[4] Defendants contend that the FAC should be dismissed for failing to state a claim under Rule 12(b)(6), or, in the alternative, for lack of subject matter jurisdiction under Rule 12(b)(1). Mtn., p. 13. However, claims asserting a violation of the APA raise federal questions sufficient to trigger Section 1331 jurisdiction. *Sovereign Iñupiat for a Living Arctic v. U.S. Bureau of Land Mgmt.*, 516 F. Supp. 3d 943, 949 (D. Alaska 2021). To invoke subject matter jurisdiction under the APA for a failure to act, Alaska must show that: (1) an agency had a discrete duty it was required to take; and (2) the agency unlawfully withheld or unreasonably delayed in acting on that duty. *See Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 63-64 (2004). Because Alaska must establish the same arguments in connection with its opposition to the motions pursuant to Rule 12(b)(1) and 12(b)(6), the reasoning and analysis discussed in Section I apply under both Rules.

original). In other words, the plaintiff must allege that an agency has a "clear, certain, and mandatory duty" and has unlawfully withheld or unreasonably delayed action. *See Vaz v. Neal*, 33 F.4th 1131, 1136 (9th Cir. 2022). An agency action can be challenged "even if the challenge would have the 'effect of requiring a regulation, a series of regulations, or even a whole 'program' to be revised by the agency in order to avoid the unlawful result that the court discerns[.]'" *Stephen v. Bureau of Indian Educ.*, No. 21-15097, 2022 U.S. App. LEXIS 6755, at *6 (9th Cir. Mar. 16, 2022) (quoting *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 894 (1990)) (reversing district court's grant of summary judgment).

Defendants attempt to narrow and reframe Alaska's allegations, arguing that Alaska merely seeks to compel the completion of two reports that DOI and BLM were ordered to prepare. Mtn., p. 14-15. Though it is true that Alaska contends the mandated reports were woefully insufficient, Alaska seeks to compel Congressionally mandated agency actions beyond their completion. As discussed below, Alaska alleges that the unequivocal mandates in the 1995 and 2014 Directives and obligations assumed in the resulting reports call for discrete agency actions that BLM and DOI were legally required, but have failed, to take. *See* FAC ¶¶ 61-68, 81-85.

A.    **Alaska Seeks to Compel Discrete "Agency Actions" that Defendants Are Required to Take.**

i.    **"Agency Action" Is a Broadly-Defined Term.**

The APA broadly defines "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or *failure to act*[.]" 5

U.S.C. § 551(13) (emphasis added). "Each word in that definition has its own expansive definition." *Nat'l Urban League v. Ross*, 489 F. Supp. 3d 939, 970 (N.D. Cal. 2020). A "rule," for example, includes "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency . . . ." 5 U.S.C. § 551(4).[5] And "relief" is defined, in part, as "the whole or part of an agency—(A) grant of money, assistance, license, authority, exemption, exception, privilege, or remedy; [or] recognition of a claim, right, immunity, privilege, exemption, or exception . . . ." *Id.* § 551(11). While "failure to act" is not defined, courts generally understand the term to mean "failure to take an *agency action*[.]" *Wilderness Alliance*, 542 U.S. at 62-63.

"The legislative material elucidating [the APA] manifests a congressional intention that [the APA] cover a broad spectrum of administrative actions, and [the U.S. Supreme Court] has echoed that theme by noting that the [APA's] 'generous review provisions' must be given a 'hospitable' interpretation." *Bowen v. Massachusetts*, 487 U.S. 879, 903, 904

---

[5] Courts interpreting the definition of "rule" under the APA have considered a wide array of activities to be "rules." *See, e.g.*, *U.S. Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1149-1151 (5th Cir. 1984) (finding, in a suit under different APA provisions, that OSHA's administrative plan outlining procedures for agency investigation was a "rule" under 5 U.S.C. § 551(4), particularly in light of OSHA's enabling statute authorizing the promulgation of rules and regulations to carry out agency responsibilities); *W. Watersheds Project v. Zinke*, 441 F. Supp. 3d 1042, 1048, 1062 (D. Idaho 2020) (concluding, in an APA 706(2) case, that BLM's Instruction Memorandum "supplying changed instructions to the agency's offices about how to handle [certain] leases" was a "rule" under 5 U.S.C. § 551(4), even if it was "patchwork of both policy and rule" because "the placement of a rule in tandem with a policy, or a policy in tandem with a rule, does not hide the rule or insulate the rule from judicial review"); *Herron v. Heckler*, 576 F. Supp. 218, 230 (N.D. Cal. 1983) ("staff instructions" and "claims manual instructions" were "rules" designed to implement, interpret and/or prescribe law).

(1988) (citations omitted)). As Defendants concede (Mtn., p. 13), the term "agency action" "is meant to cover comprehensively every manner in which an agency may exercise its power." *United Farm Workers v. Perdue* ("*UFW*"), No. 1:20-cv-01452-DAD-JLT, 2020 U.S. Dist. LEXIS 201069, at *20 (E.D. Cal. Oct. 28, 2020) (citations omitted)).

Consequently, courts have considered a wide array of activities or conduct to be "agency action." For example, an agency's failure to create a plan when it had the duty to do so constitutes an "agency action." *See In re Pub. Emps. for Envtl. Responsibility*, 957 F.3d 267, 269 (D.C. Cir. 2020).[6] In *In re Pub. Emps.*, plaintiffs sought to compel creation of management plan called for in the Air Tour Management Act. *Id.* at 273. The defendant agencies argued they had no duty to act because "completion of a management plan [or voluntary agreement] is not a ministerial, clear-cut, or non-discretionary duty" that requires them to exercise "discretion[.]" *Id.* The D.C. Circuit rejected this argument, stating that the agencies "confuse[] the *creation* of the plans with their *content*. While the latter may be discretionary, the former is not. . . . The agencies may not ignore this clear command." *Id.* (emphasis added).

Additionally, the Ninth Circuit has found that failing to comply with an ongoing obligation can be an "agency action" under the APA. *Vietnam Veterans of Am. v. Cent. Intel. Agency* ("*Vietnam II*"), 811 F.3d 1068, 1075 (9th Cir. 2016) (analyzing the text of an army regulation, "internal agency discussions in the years leading up to the" revisions to

---

[6] The holding in *In re Pub. Emps.* applies to our APA claims despite the case involving mandamus relief rather than remedy under the APA. *See Sims v. Ellis*, 972 F. Supp. 2d 1196, 1204 (D. Idaho 2013) ("[A] claim seeking mandamus and one seeking relief under the APA 'is essentially the same[.]'").

the relevant regulations, and regulatory intent to determine that the Army had an ongoing notification and medical care obligations—and that failure to comply with these ongoing obligations was an "agency action"). And, lastly, courts have found that "an action called for in a plan may be compelled when the plan merely reiterates duties the agency is already obligated to perform, or perhaps when language in the plan itself creates a commitment binding on the agency." *Wilderness Alliance*, 542 U.S. at 71.

### ii. Courts May Compel "Required" Agency Actions.

To compel an agency action under Section 706(1), there must be a "'specific unequivocal command' to take 'discrete agency action.'" *Vietnam II*, 811 F.3d at 1078 (quoting *Wilderness Alliance*, 542 U.S. at 63-64). "[A]gencies do not possess the discretion to avoid discharging the duties that Congress intended them to perform." *Marathon Oil v. Lujan*, 937 F.2d 498, 500 (10th Cir. 1991). Thus, courts may compel discretionary acts when the agency "simply refuse[s] to exercise his discretion." *Sims*, 972 F. Supp. at 1204 ("[A]t some level, the [agency] has a general non-discretionary duty to" act) (internal quotations omitted); *Marathon Oil*, 937 F.2d at 501 ("[T]he district court can compel [agencies] to exercise their discretion" without "dictat[ing] how that discretion is to be exercised.").

Congress may command agency actions through a number of mechanisms, including by statute, appropriation acts, or other congressional directives. *See Fund for Animals v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 19 n.7 (D.C. Cir. 2006) ("Congress may ratify an agency action through appropriation acts."); *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991) ("[A]n agency should always consider the

views of Congress, expressed, to the extent that the agency can determine them, in the agency's statutory authorization to act, as well as in other congressional directives."); *Wilson v. Watt*, 703 F.2d 395, 402 n.14 (9th Cir. 1983) ("Principles for interpreting congressional intent from appropriations act and committee reports are well established."). And, agencies may impose upon themselves requirements to act through various means. *See*, *e.g.*, *Wilderness Alliance*, 542 U.S. at 71 (opining that "an action called for in a plan may be compelled" if "language in the plan itself creates a commitment binding on the agency"). Lastly, at least one court has recognized that lack of funding does not justify lack of action where the agency has had substantial time to "order[] their budget priorities in such a way as to make at least significant progress towards accomplishing" their required actions. *See Padilla Constr. Co. v. Acosta*, No. 18-1214-GW(AGRx), 2022 U.S. Dist. LEXIS 95887, at *60-62 (C.D. Cal. Mar. 25, 2022).

### iii.   The 1998 Report Responding to the 1995 Directive Binds DOI and BLM to Take Discrete Agency Actions.[7]

In the 1995 Directive, codified as an amendment to ANCSA, Congress directed DOI to submit a report on "lands conveyed or prioritized for conveyance" pursuant to ANCSA including, among other things, "existing information concerning the nature and types of contaminants" on ANCSA Lands prior to conveyance and "existing information identifying to the extent practicable the existence and availability of potentially responsible

---

[7] Defendants contend that Alaska "acknowledge[d] the[] legal infirmity" of its now withdrawn claims concerning the 1990 Directive, and that this acknowledgement should apply to the 1995 and 2014 Directives. *See* Mtn. at 13, n. 4. This contention is entirely meritless. Congress imposed different and additional obligations in 1995 and 2014, which Defendants have yet to complete.

parties for the removal or remediation of the effects of such contaminants" and recommendations on "any additional legislation that the Secretary concludes is necessary to remedy the problem of contaminants on the lands[.]" FAC Ex. B, p. 3-4.

In response to the 1995 Directive, DOI and BLM submitted the 1998 Report to Congress; in this report, DOI and BLM expressly committed to certain ongoing duties, and failure to complete these duties constitutes "agency actions" under the APA. For example, DOI agreed that it "*will* coordinate implementation of" "recommendations" outlined in the 1998 Report, including: (1) "[c]ompil[ing] a coordinated, comprehensive inventory of contaminated sites with input from all parties"; (2) "[a]nalyz[ing] the data collected and report to Congress on sites not covered in existing programs and recommend whether further Federal programs or actions are needed"; and (3) "[m]odify[ing] policies, where needed, to address contaminants and structures that may affect public health and safety on ANCSA lands" FAC Ex. C, p. 7 (emphasis added). And, while DOI and BLM admitted that "the full extent of contaminated ANCSA lands c[ould not] reliably be determined" as of the date of the 1998 Report, taking the above-listed actions would enable the agencies to recommend "any additional legislation that the Secretary concludes is necessary to remedy the problem of contaminants on the lands" as required by the 1995 Directive. FAC Ex. C, p. 8, 40.

DOI also stated that it "*will* continue to work with" federal agency programs that were addressing certain contaminated ANCSA sites "to ensure that cleanup efforts will continue." FAC Ex. C, p. 40 (emphasis added). And importantly, DOI and BLM pledged

*twice* within its report that, "[w]ith respect to lands yet to be conveyed, we *will* take all practicable steps to avert the future conveyance of contaminated land"—which ANCSA[8] and the other statutes already required DOI and BLM to do. FAC ¶ 54 (quoting FAC Ex. C, p. 7, 10) (emphasis added); 42 U.S.C. § 9620(h).[9]

The 1998 Report's text makes clear that DOI's statements are binding commitments that constitute discrete agency actions that this Court may compel. *See*, *e.g.*, *Wilderness Alliance*, 542 U.S. at 71 ("[A]n action called for in a plan may be compelled . . . perhaps when language in the plan itself creates a commitment binding on the agency."). "'The primary consideration for determining'" whether an agency is bound by its statements "'is whether the text of the agency statement indicates that it was designed to be binding on the agency.'" *Trout Unlimited v. Lohn*, No. C05-1128C, 2005 WL 3242262, at *5 (W.D. Wash. Nov. 30, 2005), *aff'd and rev'd in part, and remanded on other grounds*, 559 F.3d 946 (9th 2009) (quoting *Farrell v. U.S. Dep't of Interior*, 314 F.3d 584, 591 (Fed. Cir. 2002)); *Service v. Dulles*, 354 U.S. 363, 388 (1957) ("While . . . the Secretary was not obligated to impose upon himself these more rigorous substantive and procedural standards, neither was he prohibited from doing so . . . and having done so he could not . . . proceed without regard to them.").

For example, an agency's use of "clear language of commitment" or "'will' statements" indicates its intent to be bound by its statements. *See Or. Nat. Desert Ass'n v.*

---

[8] Requiring the transfer of lands to be done "in conformity with the real economic and social needs of Natives. . . ." 43 U.S.C § 1601(a)–(b).

[9] *See supra* note 3.

*Bushue*, 3:19-cv-1550-SI, at *29-30 (D. Or. Dec. 7, 2022).[10] Such statements will bind the agency regardless of whether the statements "may be modified" or include "some permissive language." *Trout Unlimited*, 2005 WL 3242262, at *4-5.[11] Thus, DOI's commitments in its 1998 Report, described above, constitute discrete and required agency action because it used "clear language of commitment" and "'will' statements" and "represent[ed] to the public[,]" that it would "comply with the . . . commitments it makes . . . ." *See Friends of Animals v. Sparks*, 200 F. Supp. 3d 1114, 1123 (D. Mont. 2016);[12] *see also Bushue*, 3:19-cv-1550-SI, at *29-30.

Further, DOI's statements committing to implement the recommendations and policies called for in the 1995 Directive fit squarely within the APA's definition of "rule" or the "equivalent" thereof. *See* 5 U.S.C. § 551(4) (defining "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to

---

[10] In *Bushue*, the Court analyzed whether BLM was bound by a process outlined in its Approved Resource Management Plan Amendment. 2022 U.S. Dist. LEXIS 220400, at *29-32. In evaluating the text of the plan, the court found that BLM's plan included an "immediate, binding commitment to set aside 22,765 acres as unavailable to grazing" and that the agency "'went out of its way to make clear it was committing to a certain process' of closing specific areas to grazing." *Id.* (quoting *Sparks*, 200 F. Supp. 3d at 1125).

[11] In *Trout Unlimited*, the Court found that statements made by the National Marine Fisheries Services within its Hatchery Listing Policy ("HLP") were binding where "a careful reading of the text reveal[ed] the HLP, despite some permissive language, to be mandatory in its key operative parts" because it provided a "step-by-step process" for the agency's consideration, and mandated that the agency "will" take certain steps. 2005 WL 3242262, at *3-6.

[12] In *Sparks*, the Court, again, analyzed the text of an agency's statement in a Record of Decision to determine whether BLM had created a binding commitment that the agency would have to follow. The court ultimately found BLM use of "will" to describe its action persuasive. As the court explained, "if this language does not constitute a commitment, then no language would suffice." *Sparks*, 200 F. Supp. 3d at 1125 (finding that BLM's statement that "the AML will be re-calculated within five years or after the revision to the Billings RMP whichever comes first" was binding upon the agency).

implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency . . . ."). *And* DOI's failure to prepare, or act in accordance with, a rule is an "agency action" subject to judicial review. 5 U.S.C. § 551(13) (defining "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, *or failure to act*") (emphasis added).

Defendants rely heavily on *Fund for Animals v. U.S. Bureau of Land Mgmt.* to argue that Alaska has failed to allege "agency actions" subject to this Court's review. Mtn., p. 14. However, *Fund for Animals* is neither instructive nor persuasive. In that case, plaintiffs brought a Section 706(2) challenge, arguing BLM's strategy to comply with its statutory mandates under the Wild Free-Roaming Horses and Burros Act violated the statute. 460 F.3d at 17. BLM's strategy was found in a budget proposal to Congress, and detailed "many individual actions" including some "yet to be taken." *Id.* at 20 (quoting *Nat'l Wildlife Federation*, 497 U.S. at 893). The court noted that the purpose of budget requests is to "seek funding," and thus BLM's strategy in its proposal was not an "agency action" because it merely served as a "planning document" that "outline[d] the goals and methods of an administrative program." *Fund for Animals*, 460 F.3d at 19, 20.

Unlike the budget proposal in *Fund for the Animals*, the language in the 1998 Report commits BLM to "coordinate" specific tasks. And BLM's pledge to "take all steps practicable to ensure it did not convey contaminated land", in conjunction with its statement specifying that field investigations are necessary to assess whether a site is contaminated prior to its transfer, clearly delineated the procedural steps BLM prescribed

State of Alaska, et al. v. United States, et al.
Response in Opposition to Defendants' Motion to Dismiss
21
Case 3:22-cv-00163-HRH   Document 25   Filed 01/11/23   Page 27 of 43

as necessary prior to completing future conveyances—*i.e.*, conduct field investigations. Thus, its statements and commitments in the 1998 Report serve as BLM's explicit assumption of obligations, including to prepare a comprehensive site inventory, and further investigate the sites. *See*, *e.g.*, *Sparks*, 200 F. Supp. 3d at 1123 (finding that BLM was bound to a commitment it had made in a record of decision); *Wilderness Alliance*, 542 U.S. at 71. And, Congress's subsequent 2014 Directive requiring a report on the "progress" from the recommendations outlined by DOI and BLM in the 1998 report further support that Congress viewed the agencies' undertakings as mandatory, continuing duties.[13]

### iv. The 2014 Directive Requires DOI and BLM to Take Discrete Agency Actions.

After almost two decades with little to no progress made on the steps necessary for DOI to cleanup ANCSA Lands (FAC ¶ 44), Congress again directed that DOI "shall" provide a detailed report to Congress with the following information: "(1) a comprehensive inventory of contaminated sites conveyed through ANCSA, including sites identified subsequent to the 1998 report; (2) an updated status on the six recommendations listed in the 1998 report; and (3) a detailed plan on how the Department intends to complete cleanup of each contaminated site." FAC Ex. D, p. 455.

As an initial matter, DOI and/or BLM's non-discretionary duty to take the mandated

---

[13] Importantly, even if the agencies' commitments were discretionary, which they are not, the agencies have stalled action for over twenty years. And because "[a]t some level, the [agency] has a general non-discretionary duty to" act, the court may still compel action even if its finds its commitments were discretionary. *Sims*, 972 F. Supp. at 1204; *Marathon Oil*, 937 F.2d at 501 ("[T]he district court can compel [agencies] to exercise their discretion" without "dictat[ing] how that discretion is to be exercised.").

actions is evidenced by the use of "shall" in the 2014 Directive. FAC ¶ 44; *see Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 35 F. Supp. 3d 1137, 1151 (N.D. Cal. 2014) (citing *Bennett*, 520 U.S. at 172) ("[The Act] states that the Secretary 'shall' develop a recovery plan, and the Court finds that the terms of this section are 'those of obligation rather than discretion.'"). Further, the mandated actions restated and put a timeline on several pre-existing obligations—including preparing a "comprehensive" contaminated site inventory, which DOI and BLM committed to do in 1998.

In addition, and perhaps most importantly, the 2014 Directive required DOI and/or BLM to prepare a "detailed plan on how the Department intends to complete cleanup of each contaminated site" within 180 days. This Congressional mandate to prepare a plan constitutes a discrete agency action which this Court may compel. *First*, remediation plans, such as this, fall squarely within APA's definition of a "rule" or "equivalent" thereof which is broadly construed and "must be given a 'hospitable' interpretation," because they are designed to specify the steps to achieve environmental conditions required by law. *See Bowen*, 487 U.S. at 903-04 (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140-141 (1967)); *see also* 5 U.S.C. § 551(4) (defining "rule"). The Congressionally-mandated plan here was intended to be a statement from DOI and/or BLM laying out the procedure and implementing steps on how the agencies will "complete cleanup of each contaminated site." And failure to make such a plan is a "failure to act" in violation of the APA.

*Second*, at least one Circuit Court addressing a similar issue found that it could compel an agency to prepare a legally required management plan. *See In re Pub. Emps. for*

*Envtl. Responsibility*, 957 F.3d at 273 (rejecting an agencies' view that the completion of a management plan was not a discrete agency action, and explaining that the agencies' argument "confuses the *creation* of the plans with their *content*." (emphasis in original)). Congress's command for the creation of a plan is a "non-discretionary" command that "agencies may not ignore[.]" *Id.*

Defendants attempt to disguise their utter failure to act by claiming Congress merely imposed "reporting requirements" which they in turn claim are not "agency action" under the APA. Mtn., p. 13. This argument misconstrues Alaska's allegations and relief sought, and lacks merit. Mtn., p. 13. As described above, Alaska does not seek to compel reports; it seeks to compel several discrete, mandatory requirements imposed upon DOI and BLM.

Thus, Alaska has sufficiently alleged that DOI and BLM were required to take discrete agency action identified in the 2014 Directive and committed to in the 1998 Report by the agencies themselves.

### B. Alaska Has Sufficiently Alleged that DOI and BLM Have Failed to Take Actions Required by the 1998 Report and 2014 Directive.[14]

Upon determining that a plaintiff sufficiently alleged a discrete and required agency action, courts must then determine whether the agency failed to act. 5 U.S.C. § 706(1). Alaska is entitled to relief pursuant to Section 706(1) because it has sufficiently alleged DOI and/or BLM failed to take the discrete, mandatory agency actions discussed above.

---

[14] Alaska has sufficiently pled two claims under Section 706(1) of the APA—one claim that Defendants have unlawfully withheld agency action, and one claim that Defendants have unreasonably delayed agency action. While each of these claims has its own nuances and requires its own analysis, Defendants only lodge a general challenge that there has been no "genuine failure to act." Therefore, this section is limited to that one issue.

Specifically, Alaska alleges that the Defendants have failed to: (1) complete a "comprehensive inventory" of contaminated ANCSA Lands; (2) prepare a detailed plan on how the Department intends to complete cleanup of each contaminated site"; (3) take the pledged steps to prevent continuing transfers of contaminated lands to Alaska Natives under ANCSA; and (4) to make reasonable progress on the multitude of actions it agreed to coordinate and undertake in the 1998 Report.

In mandating DOI and BLM to undertake these discrete and required agency actions, Congress directed DOI complete the necessary steps for the expeditious cleanup of the ANCSA Lands. In failing to take these discrete and required agency actions, not only are the Defendants violating Section 706(1) of the APA, but they are delaying the ultimate goal prescribed in the plain language of the 2014 Directive—that DOI "complete cleanup of each contaminated site." *See* FAC Ex. D, p. 455 (explaining that the plans must indicate how "the *Department intends* to complete *cleanup* of each contaminated site" (emphasis added). While Defendants concede that the 1990, 1995, and 2014 Directives imposed upon DOI and BLM obligations to take action, they contend that they "took the specific actions that they were required to take" by delivering the 1991, 1998, and 2016 Reports, and that Alaska's true complaint lies with the sufficiency of those actions. Mtn., p. 15.

However, Alaska alleges, and Defendants do not dispute, that DOI and BLM have yet to complete a "detailed plan on how the Department intends to complete cleanup of each contaminated site" despite being ordered to do so in the 2014 Directive. Instead of preparing an *actual plan*, in their 2016 Report, DOI and BLM submitted

State of Alaska, et al. v. United States, et al.
Response in Opposition to Defendants' Motion to Dismiss

25

Case 3:22-cv-00163-HRH   Document 25   Filed 01/11/23   Page 31 of 43

"Recommendations for a Clean-Up Plan" which shift the burden and responsibility of creating a plan to Alaska. FAC Ex. E, p. 28-29. If Congress wanted Alaska to shoulder the burden to develop a cleanup plan for each site, it could have easily stated as much; instead, it unequivocally commanded DOI and/or BLM to take this action.

Alaska further alleges, and Defendants do not dispute, that while DOI and BLM began preparing a self-titled "preliminary" inventory of contaminated ANCSA Lands, they have yet to complete this inventory—a step that "will enable the Department to report back to Congress regarding additional action that may be required for sites that are not covered in current cleanup programs." FAC Ex. C, p. 7. DOI and BLM further admit that "without an accurate inventory it is not possible to know if" legislation creating "an additional Federal [cleanup] program is necessary"—a task it was charged to evaluate in 1995. FAC Ex. C, p. 40.

Defendants' assertion that DOI and BLM have taken initial steps towards completing these required agency actions does not absolve them of their duty to *actually and timely complete* such actions. The Ninth Circuit has held on multiple occasions that agency actions may be compelled even when the agencies took some steps or did preliminary work. *In re A Cmty. Voice*, 878 F.3d 779, 783 (9th Cir. 2017) (finding egregious delay in violation of the APA even though the "EPA appears to have done some work" including forming an advisory board to advise the agency, proposing methodologies to accomplish the required action, performing a literature review, and more); *Nat. Res. Def. Council, Inc. v. U.S. Envtl. Prot, Agency*, 956 F.3d 1134, 1140, 1142-43 (9th Cir. 2020)

(compelling unreasonably delayed agency action and rejecting EPA's contention that it made "a reasonable amount of progress" because EPA's "actions d[id] not represent 'a reasonable amount of progress'" but instead "show[ed] the same pattern of delayed action—spurred only by outside prompting").

The D.C. Circuit agrees. *In re Pub. Emps. for Envtl. Responsibility* involved a challenge to the Federal Aviation Administration and National Park Services' failure to create "air tour management plans." 957 F.3d at 269. The "agencies kept busy" and took "steps to establish management plans," by establishing an advisory group, publishing a rule, and launching a permit system, but "never got 'beyond [the] initial stages of environmental review.'" *Id.* at 269-70. Congress tried to advance their efforts by amending the statute and allowing agencies to "enter into voluntary agreements in lieu of management plans." *Id.* After the amendment, the agencies again, took some steps to complete their duties by entering into voluntary agreements with some park operators. However, despite the agencies' efforts, which spanned more than a decade, the court found that their failure to create management plans for those parks without a voluntary agreement was an "agency action"—and failure to make these plans violated the APA. *Id.* at 273, 275-76 (ordering the agencies to prepare a plan on how to come into compliance, and retaining jurisdiction to approve the plan and monitor the agencies' progress "until their statutory obligations are fulfilled"). That the Defendants have taken some steps to meet their obligations is not a substitute for actual completion of their responsibilities.

Alaska has sufficiently pled, and seeks to compel, agency action unlawfully

State of Alaska, et al. v. United States, et al.
Response in Opposition to Defendants' Motion to Dismiss

27

Case 3:22-cv-00163-HRH   Document 25   Filed 01/11/23   Page 33 of 43

withheld and unreasonably delayed under Section 706(1) of the APA, and Defendants Motion should be denied.[15]

## II. Defendants' Motion Should Be Denied Because Plaintiffs Have Sufficiently Alleged Standing.[16]

A plaintiff satisfies the standing requirement by pleading: (1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). At the pleadings stage, "general factual allegations of injury resulting from the defendant's conduct may suffice." *Id.* at 561. The Court may "presume that general allegations embrace those specific facts that are necessary to support the claim." *Oregon v. Legal Servs. Corp.*, 552 F.3d 965, 969 (9th Cir. 2009). In their Motion, Defendants argue

---

[15] Defendants' Motion to Dismiss further raises that their failure to act does not fall under the courts' authority under Section 706(2). Mtn., p. 16-19. Plaintiffs did not raise this claim in their FAC, but disagree with Defendants' arguments. And the cases Defendants cite in that section of their motion to argue that the sufficiency of "purely informational" Congressional reports cannot be challenged are inapplicable here, because claims asserted under 5 U.S.C. § 706(2)(A) require an element that Alaska's claims do not –a **final** agency action, which is a completely separate analysis. "While there are limits to what constitutes an 'agency action' . . ., the Supreme Court has held that '[t]he bite in the phrase '*final* action' . . . is not in the word 'action,' which is meant to cover comprehensively every manner in which an agency may exercise its power. It is rather in the word 'final.'" *UFW*, 2020 U.S. Dist. LEXIS 201069, at *20 (quoting *Whitman*, 531 U.S. at 478). Alaska does not have to plead "finality" for its claims, and those cases are inapposite.

[16] This section focuses on the elements of Article III standing that Defendants have challenged in their Motion. In addition to Article III standing, a plaintiff must meet a prudential standing requirement under the APA. *See* 5 U.S.C. § 701(a)(2). To plead prudential standing under the APA, a plaintiff must plead that it has been adversely affected by an agency action and "that, as a result, it suffers legal wrong or that its injury falls within the zone of interests of the statutory provision the plaintiff claims was violated.'" *See Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 459 F. Supp. 2d 874, 889-890(9th Cir. 2006) (quoting *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 976 (9th Cir. 2003)). Defendants have not raised, and therefore concede, that Alaska has prudential standing, which is therefore not discussed fully in this Response. *See Pershing Park Villas v. United Pacific*, 219 F.3d 895, 899 (9th Cir. 2000) (explaining that prudential standing, unlike constitutional standing, is waived if not raised at the district court)

STATE OF ALASKA, ET AL. V. UNITED STATES, ET AL.
RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

that Alaska has not plead the last two elements of standing: traceability and redressability. Mtn., 19-22. This argument fails.

A. **Alaska Has Pled an Injury- in-Fact—and Defendants Do Not Challenge this Element.**

Though not challenged by Defendants, a brief discussion of this first element is helpful in understanding how Alaska has met the remaining two standing elements. The injury-in-fact element requires a plaintiff to suffer "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

The Ninth Circuit has repeatedly held that "alleged interference" with an agency's "ability to discharge its obligation to protect the interests of" a state's citizens is an injury-in-fact, and that "a public agency has standing to seek judicial review of governmental action that affects the performance of its duties[.]" *Washington Utils. & Transp. Comm'n v. FCC*, 513 F.2d 1142 (9th Cir. 1975), *overruled on other grounds by Nevada v. Burford*, 918 F.2d 854 (9th Cir. 1990); *see also Cent. Delta Water Agency v. United States*, 306 F.3d 938, 950-51 (9th Cir. 2002). Furthermore, the Ninth Circuit recognizes impacts to certain interests, such as the ability to enforce health regulations, collect revenue and taxes, and protect natural resources, as injuries that can each constitute injury-in-fact. *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1198-99 (discussing cases, and holding that "each of the management, public safety, economic, aesthetic, and natural resource harms constitute injury to Sausalito's 'proprietary' interests as a municipal entity").

Alaska's FAC is replete with allegations establishing that the Defendants' inaction

has impeded the "performance of its duties" to protect the environment, natural resources, and the health and safety of its citizens.[17] Alaska has pled that "historical contamination on ANCSA Lands poses health and safety concerns to Alaska and Alaska Native Communities,[18] negatively impacts natural and subsistence resources, requires the State to expend ongoing investigation, enforcement, and remediation costs, and restricts economic activity in and of the State." FAC ¶ 4. Alaska specifically alleges that the Defendants' inaction has:

> . . . frustrated Alaska's . . . abilities to fully and fairly remedy the contamination of ANCSA Lands. BLM's inaction has allowed hazardous substances and contamination to move and spread through Alaska's surface waters, groundwater, and natural resources [and has] thwarted the identification of potentially responsible parties and investigation of the contamination.

FAC ¶ 43. Further, Alaska alleges that "a vast majority of inventoried [contaminated] ANCSA Lands . . . remain burdened with contamination that poses risks to human health

---

[17] ADEC "is a department of the Alaska Government . . . formed to 'conserve, improve, and protect [Alaska's] natural resources and environment and control water, land and air pollution, in order to enhance the health, safety, and welfare of the people of the state and their overall economic and social well-being.'" FAC ¶ 11 (citing AS 46.03.010(a); AS 46.03.020(10)(G)). "Alaska holds a trust interest in the natural resources, including water, land and air resources, within its territorial jurisdiction." FAC ¶ 11 (citing Alaska Const. art. VIII, §§ 3, 4). "To manage these natural resources, the State directed the DEC 'to conserve, improve, and protect [Alaska's] natural resources and environment FAC ¶ 11 (citing AS 46.03.010(a)). As such, both the State of Alaska and ADEC are charged with protecting the citizens and natural resources within the bounds of the state. FAC ¶ 11.

[18] To the extent that Defendants argue that Alaska does not have standing because Alaska Natives are impacted by the Defendants' inaction and widespread contamination on ANCSA lands (*see* Mtn., p. 20 n.5), the Supreme Court has squarely rejected such arguments. *See, e.g.*, *United States v. Students Challenging Regulat. Agency Proc.*, 412 U.S. 669, 686-688 (1973) ("Consequently, neither the fact that the appellees here claimed only a harm to their use and enjoyment of the natural resources of the Washington area, nor the fact that all those who use those resources suffered the same harm, deprives them of standing. . . . To deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody.").

and the environment and/or limits the use of such lands" (FAC ¶ 52), and that Defendants'

inaction has saddled Alaska with the financial burdens of attempting to address the legacy

contamination. *See*, *e.g.*, FAC ¶¶ 4, 27, 51. And lastly, the State of Alaska has alleged that

it now owns certain contaminated ANCSA Lands directly impacted by the Defendants'

inaction (FAC ¶ 3). Each of these alleged injuries constitutes injury-in-fact to Alaska.

B.     **Alaska's Injuries Are Fairly Traceable to Defendants' Challenged Conduct**

The second element of standing requires that the injuries complained of be "fairly

traceable" to the challenged conduct. *Defenders of Wildlife*, 504 U.S. at 560-61. Again, at

the pleading stage, "general factual allegations of injury resulting from the defendant's

conduct may suffice." *Id.* at 561.

Alaska unequivocally pleads that Defendants' failure to perform discrete agency

actions "has caused and continues to cause Alaska harm, including, but not limited to,

natural resources damages and lost use and value of these resources." FAC ¶¶ 73, 84, 92.

Yet Defendants incorrectly posit that Alaska complains merely of their inadequate reports

to Congress, and incorrectly contend that there is no nexus between the reports and the

injuries-in-fact. Defendants' argument is misplaced. As discussed above, Alaska does take

issue with insufficient Congressional reports but does not seek to merely compel revised

reports, and instead seeks to compel the multiple discrete agency actions that Defendants

have failed to take. *See Supra* Sec. (I)(A)(iii)-(iv). And, Alaska pleads that the Defendants'

unlawful inaction has "frustrated Alaska's . . . abilities to fully and fairly remedy the

State of Alaska, et al. v. United States, et al.
Response in Opposition to Defendants' Motion to Dismiss

31

Case 3:22-cv-00163-HRH   Document 25   Filed 01/11/23   Page 37 of 43

contamination of ANCSA Lands";[19] extensively delayed investigations and remediation; shifted the Congressionally-directed duties of evaluating, inventorying, investigating, and remediating the contamination to Alaska; allowed nefarious contamination to linger and spread; harmed natural and subsistence resources; deprived Alaska of information the United States was statutorily required to disclose;[20] and exposed Alaska and Alaska Native Communities to significant health and safety concerns. *See*, *e.g.*, FAC ¶¶ 4, 27, 43.

Defendants argue that although Alaska has pled that it suffers injury related to contamination on ANCSA Lands, Congress has not mandated DOI or BLM to "take action to remediate contamination on ANCSA lands" and therefore their failure to do so cannot be a basis for standing. Mtn., p. 21. Alaska's standing does not solely rely on Defendants' failure to remediate, and regardless, as explained above, the language of the Directives and other pre-existing statutory requirements contradict Defendants' arguments. *See, e.g.*, FAC Ex. D, p. 455. (ordering DOI and BLM to create detailed plan on how **Department intends to complete cleanup** of each contaminated site") (emphasis added); 42 U.S.C § 9620(h) (imposing investigation, notice, and covenant requirements upon federal agencies transferring federally owned property, including requiring—for "any real property owned

---

[19] An agency's allegation that an agency action "will affect the discharge by [the agency] of its duty to protect the interest of" the state's citizens meet standing's causation element. *Washington Utilities & Transp. Com. v. FCC*, 513 F.2d 1142, 1149 (9th Cir. 1975) ("And it is no bar to WUTC's standing that the line of causation between the FCC order and interference with WUTC's performance of its duties may be attenuated.").

[20] The inability to access information that the government is statutorily required to disclose is a "sufficiently distinct injury to provide standing to sue." *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449 (1989); *Fed. Election Comm'n v. Akins*, 524 U. S. 11, 20-25 (1998) (confirming that a group of voters' "inability to obtain information" that Congress had decided to make public is a sufficient injury in fact to satisfy Article III).

by the United States on which any hazardous substance was stored for one year or more, known to have been released, or disposed of"—a deed covenant warranting that "any additional remedial action found to be necessary after the date of such transfer shall be conducted by the United States"). Regardless, even if it were true that Congress has not required Defendants to execute a cleanup plan--which Plaintiffs dispute—Defendants have not complied with their requirement to *create* one, and have failed to present any plan for any site—which has interfered with Alaska's ability to accomplish its statutory duties of protecting its people, environment, and natural resources.

Further, despite DOI and BLM pledging in 1998 that, "[w]ith respect to lands yet to be conveyed, we will take all practicable steps to avert the future conveyance of contaminated land", over one-third of all contaminated sites on BLM's inventory of contaminated ANCSA sites were conveyed *after 1999* (FAC ¶ 54 (quoting FAC Ex. C, p.7, 10))—showing the Defendants' complete disregard for their obligations, and continued contribution to, *instead of mitigation and resolution of*, this already monumental problem.

Alaska has sufficiently alleged numerous injuries that are "fairly traceable" to DOI and BLM's inaction.

C.    **Alaska's Injuries Will Likely Be Redressed by a Favorable Ruling**

Finally, a plaintiff must allege that it is "'likely' . . . that the injury will be redressed by a favorable decision." *Defenders of Wildlife*, 504 U.S. at 561. "A plaintiff's burden to demonstrate redressability is 'relatively modest.'" *Albert v. Kilolo Kijakazi*, No. 1:21-cv-0004-HRH, 2021 U.S. Dist. LEXIS 146471, at *9 (D. Alaska Aug. 5, 2021) (citing *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018)). A plaintiff "need not demonstrate that there

is a guarantee that his injuries will be redressed by a favorable decision"; instead, "a plaintiff need only 'show a substantial likelihood that the relief sought would redress the injury[.]'" *Albert*, 2021 U.S. Dist. LEXIS 146471, at *9 (quoting *Renee v. Duncan*, 686 F.3d 1002, 1013 (9th Cir. 2021), and *Mayfield v. United States*, 599 F.3d 964, 971 (9th Cir. 2010)) (citations omitted).

Defendants claim that Plaintiffs' injuries cannot be redressed. The basis for Defendants' argument rests (yet again) in their mischaracterization of the relief Alaska seeks, arguing that issuing "another report" will not redress the injuries asserted. Mtn., p.22. But Plaintiffs seek not to compel "another report," but to compel a series of discrete and required agency actions that DOI and BLM have failed to take in violation of the APA. *See* Sect. (I)(A)(iii)-(iv). Alaska pleads that these violations are "continuous and ongoing" and that the United States "will continue to violate the APA until it fully and completely complies with its Congressional duties." FAC ¶¶ 74, 85. For example, Alaska seeks to compel Defendants' preparation of a "comprehensive" inventory and Defendants' preparation of a "detailed plan" on how "it intends to complete cleanup" of each site (including the investigations necessarily required by such a mandate), which would expedite the removal and treatment of hazardous substances lingering on these sites, increase the value of Alaska's natural resources, and alleviate the financial, operational, and enforcement burden of investigating, mitigating, remediating, and otherwise addressing the health, safety, and environmental risks that the legacy contamination poses to Alaska and Alaska Natives every day. And, an order compelling BLM to do as it

pledged, and take all precautions to avoid further transfers of contaminated lands under ANCSA, would allow Alaska to protect its citizens from additional exposure to contamination and prevent contaminated properties from falling into the hands of innocent parties who are potentially unaware of the existence of site contamination. Thus, the relief Alaska seeks will likely prevent or redress the injuries complained of.

Because Alaska's allegations sufficiently plead each element of standing, Defendants' Motion should be denied.

## LEAVE TO AMEND

If the Court finds that the FAC does not sufficiently allege any aspect of the claims for which Defendants seek dismissal, the State seeks leave to amend. *Belcher v. Wal-Mart Stores*, No. 3:20-cv-00194-SLG, 2020 U.S. Dist. LEXIS 171183, at *2 (D. Alaska Sep. 18, 2020).

## CONCLUSION

For these reasons, the Court should deny Defendants' Motion. However, should the Court be inclined to grant part or all of Defendants' Motion, this Court should grant Alaska leave to amend its allegations.

Dated: January 11, 2023                      Respectfully submitted,

                                    By:    TREG TAYLOR
                                           ATTORNEY GENERAL

                                           _____
                                           CODY DOIG (AK Bar No. 2109091)
                                           ASSISTANT ATTORNEY GENERAL
                                           ALASKA DEPARTMENT OF LAW
                                           1031 W. 4th Ave., Suite 200
                                           Anchorage, AK 99501-1994
                                           Telephone: (907) 269-5211
                                           Cody.Doig@alaska.gov

                                           KELLEY DRYE & WARREN LLP
                                           WILLIAM J. JACKSON
                                           (*Admitted Pro Hac Vice*)
                                           Texas Bar No. 00784325
                                           JENNIFER C. BARKS
                                           Texas Bar No. 24087257
                                           (*Admitted Pro Hac Vice*)
                                           MARIA F. PIMIENTA
                                           Texas Bar No. 24125685
                                           (*Admitted Pro Hac Vice*)
                                           KELLEY DRYE & WARREN LLP
                                           515 POST OAK BLVD., SUITE 900
                                           HOUSTON, TEXAS 77027
                                           Telephone: (713) 355-5000
                                           BJackson@kelleydrye.com
                                           JBarks@kelleydrye.com
                                           MPimienta@kelleydrye.com

                                           ANDREW W. HOMER
                                           (*Admitted Pro Hac Vice*)
                                           California Bar No. 259872
                                           7825 Fay Avenue, Suite 200
                                           La Jolla, CA 92037
                                           Telephone: (858) 795-0426
                                           AHomer@kelleydrye.com

**ATTORNEYS FOR THE PLAINTIFFS**

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of January, 2023, I electronically filed the foregoing Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss with the Clerk of Court using the ECF system, which effected service on all counsel of record.

/s/ Jennifer C. Barks
Jennifer C. Barks
